UNITED STATES of America,
Plaintiff-Appellee,

v.

George B. RILEY, Defendant-Appellant.

No. 76–1756.

United States Court of Appeals,
Fifth Circuit.

April 7, 1977.

John M. Robertson, Arthur J. Ranson, III, Orlando, Fla., for defendant-appellant.

John L. Briggs, U.S. Atty., Jacksonville, Fla., A. Thomas Mihok, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

George B. Riley, a former national bank examiner, induced the City National Bank of Cocoa to issue cashier's checks for his remittance before he paid for them. Al-

though in each case Riley paid for the check within thirty days, the bank was presented with the checks for payment before it had received the funds for them. As Riley was President, Chairman of the Board and major stockholder of the bank, the government looked askance at his conduct and obtained a ten count indictment against him for violation of 18 U.S.C. § 656.[1] A jury convicted appellant on all counts and he was sentenced to concurrent two year terms. We reverse his conviction because of the exclusion of evidence relevant to intent.

Appellant received ten cashier's checks from late 1972 to late 1973 which he used to satisfy personal and corporate obligations. He paid interest on loans, purchased shares of stock and bought three new automobiles. The checks ranged from $113.75 to $8,598.93 for a total value of $40,484.01. Riley's tardy payments insured that the bank's loss was limited to the use of the money for a short period. In effect, Riley arranged for "his own line of short-term credit, free of the accompanying nuisance of the interest charge which others in less favored positions would pay." *United States v. Killian,* 541 F.2d 1156, 1159 (5th Cir. 1976). Appellant himself issued the first such check on October 16, 1972 for $498.17 which he used to pay interest on a personal loan at another bank. The City National Bank honored the check on October 18 and Riley reimbursed the bank on November 1st. Seven of the next nine checks were issued by Mrs. Joyce Henley, appellant's personal secretary and Assistant Cashier. Two checks were issued by Mrs. Donna Garrison, Vice President and Cashier.

These transactions differ from the average customer's occasional negligent overdraft because a personal check, unlike a cashier's check, does not require the bank to disburse any money that it does not have. A personal check is a commitment of the customer, who contracts with the bank to pay the check from the funds in his account. The bank may refuse to do so if the account has insufficient funds. The cashier's check is a commitment by the *bank* to deliver cash to the payee. Since banks close less frequently and have larger reserves than customers' accounts, cashier's checks are less likely to "bounce." This explains why Thomas-Cone Lincoln Mercury was willing to part with a Lincoln Continental Mark IV in return for a cashier's check for $8,598.93. The City National Bank stood behind the check even though Riley had paid it nothing to do so.

This sounds like a funny way to run a bank. It is. The only way the practice could exist was with the cooperation of the bank auditor. Cashier's checks issued before payment were not processed through the double entry bookkeeping system. The auditor carried the bank's copy of the check "on the cuff" until the remitter paid for the check. If, as happened in each of the ten instances that formed the basis for the indictment, someone walked through the front door or came from the bank clearing house with the original check and demanded cash, the bank paid. It then had to

---

1. 18 U.S.C. § 656:

    Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

    As used in this section, the term "national bank" is synonymous with "national banking association"; "member bank" means and includes any national bank, state bank, or bank and trust company which has become a member of one of the Federal Reserve banks; and "insured bank" includes any bank, banking association, trust company, savings bank, or other banking institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

    June 25, 1948, c. 645, 62 Stat. 729.

balance the books on a phantom obligation of which it was previously unaware. The bank simply created a "force balance" by subtracting the amount of the check from one side of the ledger to even the score. Then the auditor set out to find the funds which were due the bank. Appellant covered every check, usually within two weeks.

The linchpin of appellant's defense was that he lacked the requisite intent to injure and defraud the bank. He did not deny that the checks were issued prior to payment. The evidence showed that he never tried to hide the practice from other bank officers. Appellant proffered evidence of eighty other instances during the same period when the bank had issued cashier's checks without contemporaneous payment. The remitters included the Brevard Food Stamp Office and the Cocoa High School Band Boosters. Appellant sought to cross-examine some of the bank officers on the policy allowing trusted customers to obtain cashier's checks in the same manner. He also sought to show that the transactions were regarded as informal loans or extensions of credit to bank officers as contemplated by 12 Code of Federal Regulations, §§ 215, et seq. The trial court rejected the proffer and limited the scope of examination because custom and practice could not excuse a criminal violation.

We hold that this evidence was relevant to a determination of appellant's intent to injure and defraud the bank. We reverse because it was crucial to his defense.

Intent to injure and defraud must be found to establish a § 656 violation. United States v. Mann, 517 F.2d 259, 267 (5th Cir. 1975), cert. denied 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); Williamson v. United States, 332 F.2d 123, 134 n.16 (5th Cir. 1964). Although the trial judge is traditionally accorded a wide range of discretion in the admission of evidence, United States v. Linetsky, 533 F.2d 192, 204 (5th Cir. 1976), it is axiomatic that such discretion does not extend to the exclusion of crucial relevant evidence establishing a valid defense. The government argues that "custom and usage involving criminality do not defeat a prosecution for violation of a federal criminal statute." United States v. Brookshire, 514 F.2d 786, 789 (10th Cir. 1975). In Burnett v. United States, 222 F.2d 426 (6th Cir. 1955), an Army officer was convicted of having subordinates build household items for him. On appeal the Sixth Circuit upheld the exclusion of evidence that Army custom permitted the practice. Similarly, the Ninth Circuit upheld the exclusion of evidence that other persons had submitted false vouchers to the Veterans Administration for payment. Smith v. United States, 188 F.2d 969 (9th Cir. 1951).

While a general practice is not an absolute defense to criminality we think the wiser, and in this case mandated, approach is to let the jury consider the practice in determining whether Riley intended to injure and defraud the bank. United States v. Klock, 210 F.2d 217 (2nd Cir. 1954), supports this position. Klock, a supervisor in his bank's bookkeeping department,, was charged with causing the bank to pay a customer for his checks even though the account had insufficient funds to cover them. The Second Circuit reversed the conviction under § 656 because the trial judge excluded evidence that officials at the bank had authorized the overdraft by the customer and other customers. The court rejected the theory that authorization would be no defense:

If these exhibits had been received in evidence, the jury could have then reasonably inferred that not only did the bank's officers know about the $60,000 of undebited overdrafts which the bank did not report as overdrafts to the State Banking Department and the Federal Reserve, but also that the bank's officers considered those overdrafts informally made loans. The jury could further reasonably have inferred that the bank officers, thus considering the overdrafts as loans, had authorized Klock to omit posting them as debits against depositors' accounts. In effect, the defense to the substantive counts of misapplication of funds was that the bank officials treated the overdrafts as loans. While perhaps

making of loans in this manner may be in violation of some state law, nevertheless it does not constitute a crime under 12 U.S.C.A. § 592 or 18 U.S.C. § 656, if Klock had no notice of the impropriety. Defendants were therefore entitled to introduce evidence tending to show that they were acting in accord with the bank's practice of making loans informally, and that the bank had acquiesced in Klock's bookkeeping in respect to these loans.

210 F.2d at 221.

■ We think this approach is eminently sensible. It has been recognized implicitly by our circuit. It is unnecessary for an indictment charging a violation of § 656 to allege that the misapplication of funds was without the knowledge of the bank or its board of directors, "since such consent is a matter of defense." *United States v. Mann, supra,* at 268, citing *Klock, supra.* In *United States v. Stokes,* 471 F.2d 1318 (5th Cir. 1973), Judge Wisdom distinguished *Klock* because the evidence which Stokes sought to introduce consisted of "irregularity in other unrelated and dissimilar bank operations." *Stokes, supra,* at 1321. Another facet of *Stokes* which separates it from *Klock* and our case was Stokes' failure to contend that he acted according to any regular bank policy or practice.

The government argues that *Klock* is distinguishable on two grounds: (1) the defendant in that case was a subordinate who relied upon his superiors' instructions and (2) knowledge of impropriety would obliterate the defense. It was not Klock's position at the bank so much as his state of mind that was important. If Riley believed that bank policy authorized such transactions, then he lacked the requisite intent. The government's contention that Riley was the chief executive officer of the bank and therefore could not rely on this defense is a jury argument, not a legal one. The jury might have rejected this defense as a sham. It might have considered the alleged policy to be Riley's cynical generosity to a few cronies at the expense of others. But that was for the jury to resolve.

We buttress our decision that such exclusion was reversible error by reference to *Potter v. United States,* 155 U.S. 438, 15 S.Ct. 144, 39 L.Ed. 214 (1894). Potter was charged with willfully certifying a check for a customer whose funds were insufficient. His defense was that the overdraft was being treated by the bank as a loan and that the customer was covering the certified checks as they were presented. The court agreed per Justice Brewer that:

The testimony offered tended to show an agreement on the part of the officers of the bank to treat this overdraft as a loan, drawing interest and secured by collateral, and that such agreement was carried into effect by the deposit of the collateral and the casting up of interest. If the defendant in good faith, supposed that this arrangement was the equivalent of a loan by note, and that the indebtedness of Evans & Co. was fully secured by collateral, it seems to us that the jury would have a right to be informed of the fact as bearing upon the question whether he had "wilfully" violated the statute. It cannot be that the guilt or innocence of the defendant under this indictment turns upon the mere matter of bookkeeping. While it is true that care must be taken not to weaken the wholesome provisions of the statutes designed to protect depositors and stockholders against the wrongdoings of banking officials, it is of equal importance that they should not be so construed as to make transactions of such officials, carried on with the utmost honesty and in a sincere belief that no wrong was being done, criminal offences, and subjecting them to the severe punishments which may be imposed under those statutes. We must not be understood as holding that this testimony established an absolute defence, and that by the form of such an agreement the mandatory terms of section 5208 can be evaded, but only that evidence of a positive agreement upon the part of the officers of the bank that this overdraft account should be practically treated as a loan from day to day, to be and in fact secured by ample

collateral—coupled with testimony that for the cheques certified each day there was deposited in advance an ample amount of cash—should have been submitted to the jury on the question of "wilful" wrongdoing. As "wilful" wrong is of the essence of the accusation, testimony bearing directly on the question of wilfulness is of vital importance, and error in rejecting it cannot be regarded otherwise than as material and manifestly prejudicial.

155 U.S. at 447–48, 15 S.Ct. at 147.

Riley's defense was premised upon the propriety of his practices and his lack of intent to injure and defraud the bank. His defense may or may not be reasonable to a jury but we believe he should have the right to present it.

The probable recurrence of certain other issues upon a retrial impels us to mention them briefly. Although evidence of good faith in such prosecutions is usually relevant, *see United States v. Matot,* 146 F.2d 197 (2nd Cir. 1944), the exclusion of appellant's refusal to accept salary increases during that period was a sound exercise of discretion under Fed.R.Evid. 403. *See also United States v. Dobbs,* 506 F.2d 445 (5th Cir. 1975). Of course, such exclusion was not required. Even if an instruction that there must be a probability of loss to the bank sufficient to warrant beyond a reasonable doubt that there was an intent to injure and defraud the bank were proper, *see United States v. Sorenson,* 330 F.Supp. 642 (D.Mont.1971), we do not think it was prejudicial error to refuse such an instruction. The overall charge on intent covered appellant's requested instructions on negligence and maladministration. *See United States v. Stokes,* 506 F.2d 771 (5th Cir. 1975); *United States v. Wilkinson,* 460 F.2d 725 (5th Cir. 1972). It is unnecessary to discuss appellant's other points of error.

REVERSED and REMANDED.