**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Terence George KELLY,**
**Defendant–Appellant.**

No. 88–8727.

United States Court of Appeals,
Eleventh Circuit.

Sept. 29, 1989.

Michael Kennedy McIntyre, Atlanta, Ga., for defendant-appellant.

Donald F. Samuel, The Garland Firm, Atlanta, Ga., Paul S. Kish, Atlanta, Ga., and James G. Blanchard, Augusta, Ga., for amicus curiae.

James T. Martin, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before RONEY, Chief Judge, JOHNSON, Circuit Judge, and YOUNG *, Senior District Judge.

JOHNSON, Circuit Judge:

Terence G. Kelly, a criminal defense attorney with no prior criminal record, appeals his conviction on one count of conspiracy to possess with intent to distribute one kilogram of cocaine under 21 U.S.C.A. §§ 841(a)(1) and 846, and one count of aiding, abetting, and counseling the possession with intent to distribute of one kilogram of cocaine under 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2. For the reasons discussed below, we reverse on the ground of insufficiency of the evidence. We also discuss two other grounds for reversal presented by this case.

## I. THE FACTS

Kelly's involvement in the conduct for which he was convicted grew out of his legal representation of two drug traffickers, Raul Restrepo and Cirilo Lazaro Figueroa. On October 31, 1985, Restrepo arrived in Atlanta with three kilograms of cocaine and was met by Figueroa, with whom he had had drug dealings for several years. Restrepo left the cocaine with Figueroa. One of the kilograms was yellowish in color; it was determined, after several unsuccessful sale attempts, that this kilogram was "no good" in quality, and Fi-

---

* Honorable George C. Young, Senior U.S. District    Judge for the Middle District of Florida, sitting

gueroa buried it.[1] After several days, Restrepo attempted to sell the two remaining kilograms through Raul Montes. On November 6, 1985, Montes sold the two kilograms to a customer who turned out to be a Drug Enforcement Administration ("DEA") agent; he was arrested and the cocaine was seized. Restrepo was arrested the same day when he arrived at Montes's residence to pick up his share of the money. Restrepo sought Figueroa's help in retaining a lawyer, and Figueroa referred him to Kelly.[2]

Kelly and Figueroa had had an attorney-client relationship since 1979. Aside from representing Figueroa in various legal matters, including a parole revocation hearing in 1982,[3] Kelly incorporated and represented an auto service station partly owned by Figueroa, and managed the station's financial affairs for a time. In 1986, he gave Figueroa a $10,000 loan for a real estate purchase, secured by a deed on Figueroa's home. Kelly had made a regular practice of representing drug defendants referred to him by Figueroa.

Restrepo testified that in his initial meetings with Kelly he told Kelly about Figueroa's involvement and possession of the third kilogram of cocaine, and that he asked Kelly to ask Figueroa to sell it so that the proceeds could be used to pay Kelly's attorney's fee. According to Restrepo, Kelly told Restrepo that Figueroa had already told him about Figueroa's possession of the third kilogram. Restrepo also testified that Kelly brought back a message from Figueroa a few days later that the kilogram was not salable and had been buried, that Figueroa was under too much pressure from police surveillance, and that Figueroa could no longer help Restrepo financially.

Kelly disputed all this at trial. He testified that Restrepo, at one of their first meetings, mentioned that Figueroa owed him money and was holding some "property" for him, and expressed anger that Figueroa was refusing to help him further with his legal fees. According to Kelly, Restrepo said that he had incriminating information on Figueroa, but then retracted that statement and said that he was just angry at Figueroa. Kelly testified that he informed Restrepo about the potential conflict of interest facing Kelly should Restrepo have incriminating information on Figueroa. Kelly testified that he went to Figueroa and asked him about Restrepo's claims, and was satisfied at the time, based on Figueroa's denials and Restrepo's retraction, that Figueroa was not holding any contraband for Restrepo.[4]

Restrepo eventually decided to cooperate with the Government. He pleaded guilty on February 27, 1986, and was sentenced to a 10–year term on April 2, 1986.[5] After his guilty plea but before sentencing, Restrepo

by designation.

1. This third kilogram has never been recovered and was apparently never distributed after Figueroa buried it.

2. Figueroa promised to guarantee Kelly's initial fee for appearing at Restrepo's bond hearing, should Restrepo be unable to pay it. Kelly and Restrepo later reached an agreement, however, under which Restrepo paid Kelly's entire fee himself just prior to Restrepo's sentencing.

3. Although Kelly was aware that Figueroa had a past criminal record for drug violations, one of which was the basis for Figueroa's 1982 parole revocation, Kelly himself never represented Figueroa on criminal charges. Kelly testified that he believed Figueroa had made a new start in legitimate business and was no longer involved in drugs. Figueroa testified that he never discussed his illegitimate dealings with Kelly.

4. Figueroa also testified that Kelly came to him about Restrepo's comments, and that he denied possessing any "property" of Restrepo's or owing him any money. Figueroa testified that he never said anything to Kelly regarding the third kilogram of cocaine or any of his other illegitimate activities. During Figueroa's guilty plea negotiations prior to Kelly's trial, the prospect was raised of a substantially reduced sentence, on the order of a 15– to 18–year term, if Figueroa could offer the Government any truthful evidence incriminating Kelly. Despite the repeated urging of his attorney that he provide any truthful evidence he had against Kelly, Figueroa testified on Kelly's behalf and received a 30–year sentence.

5. In January 1987, Restrepo entered into another guilty plea and cooperation agreement with the Government on a separate drug charge. Kelly did not represent him on this charge.

was debriefed by a DEA agent with Kelly present. According to Restrepo, Kelly asked him before the debriefing whether he planned to implicate Figueroa, and Restrepo indicated he did not. After the debriefing, however, Restrepo contacted the DEA agent and arranged a second interview the next day without Kelly's knowledge. At the second debriefing, Restrepo told the agent about the existence of the third kilogram of cocaine, that it was in Figueroa's possession, and that Kelly knew Figueroa had it but that Kelly was not otherwise involved. He also said Kelly had told him not to mention Figueroa's involvement.

On April 23, 1987, Restrepo made a recorded phone call to Kelly,[6] ostensibly about a legal matter concerning Restrepo's pending divorce. Restrepo told Kelly he needed to contact Figueroa in order to "get the money or ... the other thing." Kelly responded: "Yeah, yeah, right, right. As far as I know, it's just sitting somewhere. You know, it's yours, and ya know, and he's not gonna do anything with it." Pressed by Restrepo as to how to regain the "thing," Kelly first responded that he couldn't get involved with it. Then he added: "Ahh of course, [Figueroa] can't get involved, ah but if you sent someone to him or something like that, ah, you know, I don't I don't ..." Restrepo suggested "send[ing] a friend over there" or "maybe another guy who works for him or something like that." Kelly then said: "Well, I don't think he'd want to involve somebody else, ah, and I don't think he'd want to actually get anywhere near it himself." Kelly said it was a "ticklish situation," and that if Figueroa asked his advice, he would tell him "it's just not worth the risk." Kelly twice told Restrepo that "it's not worth it," and likened the "thing" at one point to a "time-bomb" that might go off if Restrepo got too close to it. Twice, however, Kelly mentioned that if Restrepo did send someone to Figueroa, "it would probably have to be someone he knows." Toward the end of the conversation, Restrepo said he would "try to do something like that."

Kelly added: "Because otherwise he, he might just think ah he's being set up." They concluded by returning to the pending divorce matter.

Immediately after calling Kelly, Restrepo called Figueroa. After discussing his divorce, Restrepo asked if "that which was left there" was still "there." Figueroa responded that it was "there like you left it," and that "[a]t any rate, I told you, nothing can be done with that." Restrepo said he would talk to Kelly about it, and concluded by saying he would send Figueroa a message through Kelly.

On June 1, 1987, Restrepo mailed a letter to Figueroa in care of Kelly, containing half a photograph of Restrepo and instructions to Figueroa in Spanish to use the photo as a code so that Figueroa could give "what you are keeping for me" to the person presenting the other half. Kelly was out of town when the letter arrived at his office. When he returned on June 8, Restrepo called him and told him about the letter, and Kelly found it on his desk. On June 9, Kelly and Figueroa were at the city jail posting bond for an employee of Figueroa's service station, and Kelly gave Figueroa the unopened letter. As Figueroa opened it, Kelly observed the half-photo fall to the ground, and noticed that it was a picture of Restrepo. Without reading the letter, Kelly told Figueroa that he didn't know what Restrepo wanted, but that under no circumstances should Figueroa do what Restrepo wanted, and that Figueroa should have nothing to do with Restrepo.

In the afternoon of June 10, 1987, an undercover DEA agent posing as a friend of Restrepo's called Kelly and asked to meet with him, saying she had something Restrepo had given her. Kelly said he thought he knew what she was talking about; he asked if she meant half a photo of Restrepo and she said yes. Kelly said: "Okay, well I can meet with you but I don't think we can do anything, but I'll meet with you and explain." That evening, Kelly met with the woman and another DEA

---

**6.** All the described phone calls were made under the supervision and instructions of the DEA, and were recorded and admitted as evidence at trial.

agent posing as her brother-in-law. They asked if they could pick up the package or money for Restrepo. Kelly said he knew why they were there, but that he didn't think anything could be done about the package or money they were expecting. When they asked to meet Figueroa, Kelly told them he would advise Figueroa not to meet with them because it was not in Figueroa's best interest. Kelly said that for all he knew they could be DEA agents attempting a set-up. He said he was a lawyer and could not afford to put himself in a situation where he might get into a legal bind; he also noted that Figueroa was a previously convicted felon who would get a lengthy sentence for any new offense. When they asked Kelly to call Figueroa for them, he refused, reiterating that as Figueroa's lawyer he believed it would not be in Figueroa's best interest. After leaving the meeting, Kelly did attempt to place a call to Figueroa but couldn't reach him. Later that evening, Kelly left a message with an employee of Figueroa's reiterating his previous advice that Figueroa have nothing to do with Restrepo or anyone acting on his behalf.

On June 15, 1987, Restrepo called Kelly again and expressed his disappointment that Figueroa had not yet given him the package or any money. Kelly responded that he was advising Figueroa not to do anything and that he would give Restrepo the same advice if their positions were reversed. In response to Restrepo's continued queries as to how to get his package or money, Kelly said Restrepo was putting him in a very awkward position. Restrepo complained about the advice Kelly was giving Figueroa, and Kelly responded that "advice is one thing but when you start talking about specifics ... [t]hat's called a conspiracy ... [a]nd my neck goes on the line ... [a]nd that ... and a thousand times more than that is not worth that,

Raul." He told Restrepo repeatedly that "it's just not worth the risk," and he observed that "if [Figueroa] got caught with anything they'd put him under the jail. Not in the jail, under the jail." Restrepo again complained that he didn't want to lose what Figueroa was holding for him, and Kelly responded: "I'd advise him not to fool with anything. It's just too risky." Kelly stated that he couldn't talk about it on the telephone, and he concluded by rejecting Restrepo's suggestion that he give Figueroa different advice.

Finally, on June 16, 1987, Restrepo called Kelly yet again, stating that he desperately needed money and that if he didn't get it he would "blow up the whole thing." Kelly responded: "Do what you have to do." He reiterated: "I cannot advise [Figueroa] to do anything that's gonna get him into trouble."

Charles Wills, an experienced lawyer and longtime legal associate of Kelly, testified that Kelly came to him on June 15 or 16, 1987, and described Restrepo's phone calls and the June 10 meeting with Restrepo's purported friends. According to Wills, Kelly stated that he believed Figueroa was not presently dealing in drugs, and that his motive in accepting Restrepo's calls and going to the June 10 meeting was to keep Restrepo or anyone else from enticing Figueroa back into the drug business. Wills testified that Kelly was a naive person, and that he told Kelly he was probably being set up but that Kelly didn't believe it. He also testified that he advised Kelly that Kelly couldn't reveal Restrepo's statements without risking disbarment.

## II. THE TRIAL AND PROCEDURAL HISTORY

Kelly was arrested on June 24, 1987. He was indicted the next day along with Figueroa and six others.[7] Kelly requested

---

7. Count One of the six-count indictment provided as follows: "That, on or about October of 1985 to the date of this indictment [June 25, 1987], in the Northern District of Georgia, the defendants, CIRILO LAZARO FIGUEROA, MANUEL NINO TREVINO, JR., HIRAM LUIS CAJIGAS, NELSON MANUEL CRUZ, TERANCE

[sic] GEORGE KELLY, CAROLYN JOYCE BATES, WILLIAM BOYD, and ALFREDO ARNALDO TORRES CARRERO did unlawfully combine, conspire, confederate, agree and have a tacit understanding with each other to violate [21 U.S.C.A. § 841], to wit: to unlawfully possess with intent to distribute and distribute co-

and was granted a separate bench trial following sentencing of his codefendants, all of whom eventually pleaded guilty.[8] Kelly's trial began on Wednesday, March 30, 1988. On Friday, April 1, the district judge realized that Charles Wills was going to be a witness for Kelly when Wills's name appeared in a notation to a telephone transcript and was mentioned during Kelly's testimony. The judge had known for several months that Wills was going to be testifying in his court in some case. The judge's wife and Wills's wife were close personal friends, and Wills had been avoiding contact with the judge at social functions. On Monday, April 4, the judge noticed Wills's wife sitting in the courtroom, and he invited her back to his chambers. The judge asked why she was in court and she responded that her husband was going to testify in the case. The judge commented to her that he wished it were a jury trial rather than a bench trial.

On Tuesday, April 5, the judge informed the parties of the situation.[9] He declared: "I don't see anything to do but ... just simply recuse myself from this trial. I can't be put in this position.... Somebody should have told me about this.... I never would have agreed to try this case nonjury had I realized this." The judge stated that the situation put him in an embarrassing position, and created the risk that he might bend over backwards to prove he lacked favoritism toward Wills, with detrimental results for Kelly. Conversely, he stated that if he found Kelly guilty he felt he might jeopardize his wife's friendship with Mrs. Wills. The judge described himself as being "caught between a rock and a hard place," and he revealed that he had argued with his wife about the situation.

After raising the issue *sua sponte*, however, the judge decided not to recuse himself. The judge made it clear that he would have recused himself if he had been confident that retrial would not be barred by double jeopardy principles.[10] He left it to the parties to jointly consent either to a mistrial or to his continuing to sit on the case. The Government offered to consent to a mistrial if Kelly also consented. Kelly's attorney declined, stating that Kelly had "spent a great deal of money and ... gone through a great deal. We would like to go ahead and leave it with the court." The judge thereafter continued with the trial.

The judge indicated on several occasions that he held Kelly responsible for putting him in such a difficult position. He stated during trial that "that may have been the ace in the hole that [Kelly] had, and he could have done something about it. He didn't do it." Later, just prior to rendering

caine, a Schedule II narcotic controlled substance, in violation of [21 U.S.C.A. § 846]."

Count Four provided: "That, on or about October of 1985 to the date of this indictment [June 25, 1987], in the Northern District of Georgia, the defendant CIRILO LAZARO FIGUEROA, aided, abetted, and counseled by the defendant TERANCE [sic] GEORGE KELLY, did unlawfully possess with the intent to distribute approximately one kilogram of cocaine, a Schedule II narcotic controlled substance, in violation of [21 U.S.C.A. § 841] and [18 U.S.C.A. § 2]."

Counts Two, Three, and Five related to cocaine sales arranged by Figueroa in May and June of 1987, in which Kelly was not involved and of which he had no knowledge. The buried "third kilogram" was not involved in the sales covered by Counts Two, Three, and Five. Count Six related to a firearms violation involving defendants Boyd, Carrero, and Cruz.

Of the six codefendants other than Figueroa, Kelly had never met Boyd, Bates, Carrero, or Trevino. He had previously represented Cruz, however, and he knew both Cruz and Cajigas as employees of Figueroa's service station.

8. Figueroa pleaded guilty to Counts One and Two of the indictment on February 5, 1988, pursuant to a negotiated plea agreement under which the Government dismissed the other counts against him.

9. The judge stated at that time that he "probably should have done something about it Friday, but I'm not sure the extent to which it sank in Friday." He stated that the problem "really began to sink in" when he observed Mrs. Wills in the courtroom on Monday.

10. Upon first raising the issue, the judge stated: "Now, I'm not absolutely going to recuse myself until we get one thing decided ... if I do recuse myself, even though jeopardy has attached, would that bar a retrial?" Later, the judge stated: "I'm possibly moving to recuse myself, and that's the question that's going to be determined largely by whether or not a recusal ... *sua sponte* would prevent a second trial."

the verdict, the judge stated that while he was "willing to accept that it was not done deliberately," he would have hoped that Kelly would have come to him and informed him about the situation. "[H]ad that been done, I would have gotten out of the case just like that, or I would have let it be tried to a jury, one of the two. So it has caused me considerable anxiety ..." In an April 22, 1988 order denying Kelly's post-trial motion to recuse him from further proceedings, he stated:

> The undersigned wishes that defendant had informed him prior to the start of trial that Mr. Wills would be testifying so that the undersigned had not been placed in such an awkward position. Had the undersigned been so informed prior to trial, he could have recused himself *sua sponte* or on defendant's motion without creating double jeopardy problems or could have denied defendant's request for a bench trial and instead held a jury trial. Unfortunately, defendant did not do so, and he cannot now be heard to complain that the undersigned was biased because of his acquaintance with Mr. Wills.

The district court found Kelly guilty on both counts on April 6, 1988. On April 22, 1988, the district judge denied Kelly's post-trial motion to recuse him from further proceedings, and on May 3, 1988, denied

Kelly's supplemental motion for recusal and a new trial. Kelly's appeal to this Court for a writ of mandamus and stay of proceedings was denied on July 8, 1988. On September 16, 1988, the district court denied Kelly's motion for judgment of acquittal and renewed motion for a new trial. On October 7, 1988, Kelly was sentenced to five years' imprisonment with four years' special parole on the aiding and abetting count and a concurrent five years' imprisonment on the conspiracy count.[11] On appeal, Kelly claims that (1) the evidence is insufficient to support his conviction on either count, (2) the district court abused its discretion by excluding testimony relevant to his defense, (3) the district court abused its discretion by failing to recuse itself under 28 U.S.C.A. § 455, (4) his prosecution should be dismissed on grounds of outrageous governmental conduct,[12] and (5) the district court erroneously sentenced him to a mandatory minimum five-year term under 21 U.S.C.A. § 841(b)(1)(B), as amended by the Anti–Drug Abuse Act of 1986, § 1002, 100 Stat. 3207–2.[13]

## III. DISCUSSION

### A. Sufficiency of the Evidence

Sufficiency of the evidence is a question of law subject to *de novo* review by this Court. We owe no special defer-

---

**11.** The district court denied Kelly's motion for bond pending appeal and he began serving his sentence on November 14, 1988. Kelly moved this Court for bond pending appeal on June 23, 1989, pursuant to Fed.Rule App.P. 9(b). This Court granted the motion following oral argument and ordered Kelly released on his own recognizance on August 14, 1989. We note that Kelly plainly satisfied the standards set forth in 18 U.S.C.A. § 3143(b) (West Supp.1989) regarding entitlement to bond pending appeal. *See United States v. Giancola,* 754 F.2d 898, 901 (11th Cir.1985).

**12.** Kelly failed to raise this claim at trial. Our review is thus restricted to the "plain error" standard of Fed.Rule Crim.P. 52(b). *See United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (plain error review exercised only "sparingly" to correct "particularly egregious errors" in "circumstances in which a miscarriage of justice would otherwise result"). While the substantive boundaries of an outrageous conduct claim are unclear, *see Unit-*

*ed States v. Russell,* 411 U.S. 423, 425–26, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), this Court has held that such a claim can be invoked successfully only "in the rarest and most outrageous of circumstances," *see United States v. Ofshe,* 817 F.2d 1508, 1516 (11th Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987). We indicated in *Ofshe* that we would not condone the use of criminal defense attorneys as informants against their clients. *See id.* at 1516 & n. 6. Although the case at bar raises somewhat different concerns, we note that we do not necessarily condone the investigative tactic used here of employing one client as an informant and decoy against his attorney and a second client. In view of the limited scope of review of this claim, however, and because we reverse Kelly's conviction on the ground of insufficiency of the evidence, we find it unnecessary to explore the merits of the outrageous conduct claim.

**13.** Because of our disposition of this case, we need not reach this issue.

ence to the district court on this issue. *See United States v. Pareja,* 876 F.2d 1567, 1568 (11th Cir.1989). We view the evidence in the light most favorable to the Government, with all reasonable inferences and credibility choices made in the Government's favor. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Gregory,* 730 F.2d 692, 700 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). In order to find the evidence sufficient, we need not exclude every reasonable hypothesis of innocence or find the ᵥ evidence wholly inconsistent with every conclusion except that of guilt, provided that a reasonable factfinder could find that the evidence establishes guilt beyond a reasonable doubt. A factfinder may choose from among reasonable constructions of the evidence. *See United States v. Cooper,* 873 F.2d 269, 272 (11th Cir.1989); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). If there is a lack of substantial evidence, viewed in the Government's favor, from which a reasonable factfinder could find guilt beyond a reasonable doubt, the conviction must be reversed. *See Gregory,* 730 F.2d at 706; *see also United States v. Fernandez,* 797 F.2d 943, 948–49 (11th Cir.1986), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987); *United States v. Jenkins,* 779 F.2d 606, 615–16 (11th Cir.1986).

1. The Conspiracy Count

■ To prove conspiracy under 21 U.S.C.A. § 846, the Government must prove beyond a reasonable doubt that (1) a conspiracy existed, (2) the defendant knew at least the essential objectives of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy. An overt act in furtherance of the conspiracy need not be proved. *United States v. Elledge,* 723 F.2d 864, 866 (11th Cir.1984). With regard to the defendant's voluntary participation, "the Government must prove beyond a reasonable doubt that the defendant had a deliberate, knowing, and specific intent to join the conspiracy." *Jenkins,* 779 F.2d at 609.

■ Kelly's conversations with Restrepo and his meeting with the DEA agents posing as Restrepo's associates cannot themselves constitute a conspiracy, because it is legally impossible to conspire with a government agent or informant who actually aims to frustrate the conspiracy. *See United States v. Lively,* 803 F.2d 1124, 1126 (11th Cir.1986). Thus, proof of Kelly's guilt must arise, if at all, from indirect inferences drawn from his conversations and conduct. *See United States v. Peagler,* 847 F.2d 756, 757 (11th Cir.1988) (conspiracy may be proved by direct or circumstantial evidence, and may be inferred from conduct of participants); *Elledge,* 723 F.2d at 866 (conversations between defendant and informant can constitute evidence of conspiracy between defendant and third party).

As a criminal defense attorney, Kelly inevitably associated with known or probable criminals and may have acquired knowledge of criminal activities which he was bound not to reveal under the duty of attorney-client confidentiality. This Court has repeatedly held, however, that mere association cannot sustain a conspiracy conviction. *See Jenkins,* 779 F.2d at 615–16; *United States v. Kelly,* 749 F.2d 1541, 1548–49 (11th Cir.), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985); *United States v. Reyes,* 595 F.2d 275, 281 (5th Cir.1979); *United States v. White,* 569 F.2d 263, 268 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978); *United States v. Barrera,* 547 F.2d 1250, 1257 (5th Cir.1977).

While the Government need not exclude every conceivable hypothesis of innocence, *see Cooper, supra; Bell, supra, Jenkins* and *Kelly* indicate that evidence is insufficient to establish a conspiracy where such evidence is wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt.[14] In *Fernan-*

---

**14.** In *Jenkins, supra,* this Court reversed the drug conspiracy conviction of the daughter of a

*dez, supra,* the Government, as in the present case, attempted to establish a conspiracy based on comments in a recorded conversation. The defendant in *Fernandez,* in response to a codefendant's expressed need for a plane to use in importing marijuana, said: "I know a pilot who's very bold, he's a good sort." Even in conjunction with statements referring to past marijuana ventures between the two, however, we found this statement insufficient to sustain a conviction because it failed to establish the "essential element" of "an *agreement* between two or more persons to violate narcotics laws." 797 F.2d at 948–49 (emphasis in original); *cf. Elledge,* 723 F.2d at 866–69 (conspiracy established by defendant's extensive plans and conversations in soliciting a plane for use in importing drugs).

■ Construing the evidence in the Government's favor in the case at bar, a reasonable factfinder could determine that Kelly knew about the cocaine Figueroa was holding for Restrepo as early as his first meeting with Restrepo, and that Kelly counseled Restrepo not to inform on Figueroa. The evidence would thus support a conclusion that Kelly acted with disregard for professional ethics in representing Restrepo despite a conflict of interest. Kelly was not charged with legal malpractice or professional misconduct, however. On the question whether Kelly knowingly joined a criminal conspiracy to possess and distribute cocaine, the evidence, where it is not completely silent, supports little more than speculation and conjecture.

The Government seems to have two contradictory theories about what Kelly was conspiring to do. On the one hand, the Government emphasizes Kelly's comments during the April 23, 1987 telephone conversation to the effect that if Restrepo wanted to retrieve the third kilogram, he would probably have to send someone Figueroa knew. Were Restrepo not a government agent, these comments, standing alone, might support the existence of a conspiracy between Kelly and Restrepo to transfer the buried kilogram. As indirect evidence of a conspiracy between Kelly and *Figueroa,* however, they form a vanishingly thin reed. In context, Kelly's comments appear to have been made off the cuff in response to Restrepo's prodding. Most important, the thrust of those comments is overwhelmingly contradicted by the subsequent recorded phone calls, Kelly's June 10, 1987 meeting with the undercover DEA agents, and other evidence, all indicating that Kelly resolutely refused to assist or countenance any such transfer, and emphatically attempted to dissuade both Restrepo and Figueroa from undertaking it.

Indeed, the Government's alternative theory is that Kelly was conspiring to preserve Figueroa's continued possession of the cocaine, thereby "concealing" it from the Government, by obstructing Restrepo's Government-directed schemes to recover it.[15] We cannot accept such a "Catch–22" approach. Clearly, the intent behind the staged meeting between Kelly and the undercover agents was that Kelly "take the bait" by agreeing to act as middleman for the proposed transfer of the third kilogram. This would be a very different case had he done so. The fatal flaw in the Government's case is that Kelly refused to cooperate. This refusal may well have con-

codefendant where the evidence showed mere presence at her mother's home and association with other codefendants. We found that the hypothesis of guilt rested on sheer conjecture. *See* 779 F.2d at 615–16. In *Kelly, supra,* the evidence showed that an alleged conspirator had inspected a boat intended for use in importing drugs and was present in a house and car with codefendants under suspicious circumstances. We reversed because "[t]he more reasonable inference from [the defendant]'s acts ... [is] that [the codefendant] requested that [the defendant] inspect the boat without making him aware of its ultimate purpose." 749 F.2d at

1548–49. We also noted that the defendant's presence in the codefendant's house could have been for innocent social purposes, and that no evidence existed that any illegal schemes were discussed. *Id.* at 1549.

**15.** In the Government's closing argument at trial, it stated: "The object of the conspiracy is ... to keep [Figueroa] in possession and keep Mr. Restrepo's cocaine there or convert it to money.... [T]he facts as brought out to the court show ... someone participating with the ongoing hiding, concealing, this kilo of cocaine."

stituted, as Kelly maintains, a commendable attempt to dissuade both his clients from further illegal activity. The evidence may also support the theory that Kelly was attempting, out of singleminded loyalty to Figueroa, to protect him from dealing with someone whom Kelly may have suspected was a government agent. In any event, the conclusion that Kelly specifically and criminally conspired with Figueroa to possess with intent to distribute the third kilogram or to distribute it is simply insupportable on this record.[16]

## 2. The Aiding and Abetting Count

To prove aiding and abetting, the Government must prove beyond a reasonable doubt that the defendant (1) associated himself with the crime, (2) intended to bring it about, and (3) sought by his actions to make it succeed. *United States v. Broadwell*, 870 F.2d 594, 608 (11th Cir. 1989).[17] To prove a charge of aiding and abetting possession of drugs with intent to distribute, the Government must connect the defendant to both aspects of the crime: possession and intent to distribute. *United States v. Pantoja–Soto*, 739 F.2d 1520, 1525 (11th Cir.1984), *cert. denied*, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985).

We find the evidence on this count to be even weaker than that on the conspiracy charge. There simply is no evidence, reasonably construed in the Government's favor, that Kelly ever did anything to assist Figueroa's possession of the third kilogram of cocaine, or to participate in any plan by Figueroa to distribute it. *Cf. Pantoja–Soto*, 739 F.2d at 1524–27 (evidence insufficient to establish aiding and abetting even though defendants were present at the scene of the drug transaction and ran from police); *cf. also Pareja*, 876 F.2d at 1568–70 (evidence sufficient to support conviction for aiding and abetting possession with intent to distribute where defendant acted as lookout and carried telephone beeper device used by codefendant in drug deals); *United States v. Collins*, 779 F.2d 1520, 1528–31 (11th Cir.1986) (same as to convictions for aiding and abetting possession with intent to import marijuana where defendants helped arrange transportation).

The evidence does indicate that Kelly counseled Figueroa against transferring the cocaine to Restrepo. But as we noted in discussing the conspiracy count, we cannot accept the "Catch–22" theory that Kelly, by refusing to aid or abet the transfer of the cocaine *out* of Figueroa's possession (as the Government's sting operation intended), thereby criminally aided and abetted Figueroa's *continued* possession. The evidence not only fails to disprove the reasonable and innocent explanation offered by Kelly—that he was simply advising a client against further unwise and illegal activity[18]—but wholly fails to provide any

---

**16.** To the contrary, the evidence indicates that the third kilogram never was distributed and that Figueroa himself never had any intention of distributing it after he buried it, apparently because of its poor quality. *See* note 17, *infra*.

**17.** The Government must also establish beyond a reasonable doubt that the principal offense was actually committed. *See United States v. Pareja*, 876 F.2d 1567, 1568 & n. 9 (11th Cir. 1989). Figueroa never pleaded guilty to Count Four, which charged him with committing, and charged Kelly with aiding and abetting, the crime of possessing with intent to distribute the third kilogram of cocaine. The Government dismissed that count as to Figueroa in return for Figueroa's guilty plea on Counts One and Two. *See* note 8, *supra*. In his testimony at Kelly's trial, Figueroa conceded that he did in fact possess the third kilogram, and that at least during the period from October 31 to November 6, 1985 (after receiving the cocaine from Restrepo and prior to Restrepo's arrest) he intended to

distribute it and made several attempts to distribute it. Figueroa testified, however, that he reached the conclusion that the third kilogram was nonsalable and buried it permanently before referring Kelly to Restrepo following the latter's arrest.

In any event, Kelly has never challenged his aiding and abetting conviction, at trial or on this appeal, on the ground that the Government failed to prove the commission of the principal offense. We therefore assume for purposes of analysis that the Government has established that element.

**18.** We do not suggest that a factfinder must accept at face value an attorney-defendant's invocation of his professional duties to a client in explaining allegedly criminal conduct. *Cf. United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987) (where attorney tenders "facially legitimate explanation for conduct," fact-

basis other than conjecture for a finding of criminal intent with regard to either the possession or intent-to-distribute aspects of the principal crime.[19]

### B. *Exclusion of Relevant Testimony*

■ "The trial court is vested with broad discretion in ruling upon the relevancy and admissibility of evidence. Its ruling will not be disturbed on appeal in the absence of clear abuse of that discretion. Such discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense." *United States v. Anderson*, 872 F.2d 1508, 1515 (11th Cir.1989) (citations and internal quotation marks omitted). "When 'proffered evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'" *United States v. Wasman*, 641 F.2d 326, 329 (5th Cir. Unit B 1981) (quoting *Holt v. United States*, 342 F.2d 163, 166 (5th Cir.1965)). Where evidence is excluded as irrelevant under Federal Rule of Evidence 402 in violation of this standard, the conviction must be reversed. *Wasman*, 641 F.2d at 329–30; *see also United States v. Riley*, 550 F.2d 233, 237 (5th Cir.1977).

■ At trial, Kelly sought to testify regarding his understanding of his professional obligations as an attorney, and how that understanding affected his conduct. After Kelly's counsel asked him a few preliminary questions in this regard, including a question regarding Kelly's understanding of his duties of confidentiality as to Figuer-

oa and Restrepo, the district court intervened, stating: "[T]his is utter nonsense. I'm not going to listen to this. This is not relevant evidence. He's not charged with having revealed or not having revealed a confidence disclosed to him by a client." Kelly's counsel explained that the defense was trying to establish that "what he did in this case is permissible because he acted legitimately as a lawyer with clients, both Figueroa and Restrepo." The court concurred with the prosecutor's assertion that the standards of conduct had nothing to do with the criminal charges, "except insofar as it might relate to the protection of a client." Kelly's counsel specifically objected that the proffered testimony "also relates to [Kelly's] intent and his state of mind."

It is true, as the district court observed, that Kelly was not directly charged with failing to perform an act that would itself have violated his professional duties, such as revealing a client confidence. We agree with Kelly, however, that the excluded testimony was very relevant to his intent and state of mind regarding his dealings with both Restrepo and Figueroa. Kelly's duty of attorney-client confidentiality, combined with his duty to counsel his clients against committing further crimes, forms the basis for his primary defense: that he acted not with criminal intent but within the legitimate bounds of legal representation.[20] The proffered testimony was thus crucial to Kelly's defense, and its exclusion substantially hindered him from articulating this defense.[21]

finder may nevertheless find corrupt motive or intent on basis of contrary circumstantial evidence).

**19.** Indeed, the evidence indicates that Figueroa himself had no intent to distribute the kilogram during the time, after he had buried it, that Kelly may have known of its existence. *See* notes 16 & 17, *supra*. There is no evidence at all that Kelly had any knowledge of, or involvement with, Figueroa's original acquisition of the cocaine, or that he had any contact with it thereafter.

**20.** This defense, however persuasive it may be, is unquestionably valid. *Cf. Anderson*, 872 F.2d at 1515 ("Before considering whether the exclusion of evidence in support of a defense was an

abuse of discretion, we must first determine that the proffered defense was valid."). Specific criminal intent is a necessary element of both the conspiracy and aiding and abetting charges. *See* Part III(A) above.

**21.** The Government notes that the district court did admit into evidence the State Bar of Georgia handbook, including the Canons of Professional Ethics and Standards of Conduct. Kelly, however, sought to testify at length on the *application* of those standards to the specific conduct for which he was criminally charged. We agree that the professional standards themselves, of which the district court indicated it would take judicial notice in any event, cannot substitute for Kelly's explanation of how the standards affected his state of mind.

We have previously noted the relevance of ethical and professional standards of behavior for lawyers in evaluating criminal intent. *See United States v. DeLucca,* 630 F.2d 294, 301 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 819 (1981). *DeLucca,* like the present case, involved a lawyer convicted of conspiracy to distribute cocaine. In *DeLucca,* the lawyer arranged and was present at a meeting of the conspirators where they discussed the criminal scheme. We assessed his failure to report or withdraw from the conspiracy in light of his duties as a lawyer, holding that "it is appropriate to consider the canons of professional responsibility as a factor in determining DeLucca's willing participation in crime." *Id.* Other circuits have also upheld the relevance of professional standards for attorneys where offered by the Government to help prove criminal intent on the part of lawyer-defendants. *See United States v. Machi,* 811 F.2d 991, 999–1000 (7th Cir.1987); *United States v. Klauber,* 611 F.2d 512, 520 (4th Cir.1979), *cert. denied,* 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *United States v. Rabbitt,* 583 F.2d 1014, 1028–29 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). It would be incongruous to admit such evidence when tendered in support of guilt, but not when offered for exculpatory purposes.

We also find instructive the case of *Riley, supra,* where we reversed a bank official's conviction for embezzlement because he was not permitted to introduce evidence of the bank's established custom and practice of issuing cashier's checks to trusted customers without requiring contemporaneous payment. Although we found this purported standard of business conduct to be "a funny way to run a bank," 550 F.2d at 235, we held that the proffered evidence was "relevant to a determination of appellant's intent to injure and defraud the bank." *Id.* at 236. In a statement we find applicable to this case, *Riley* concluded: "[This] defense may or may not be reasonable to a [factfinder] but we believe he should have the right to present it." *Id.* at 238.

For the foregoing reasons, the district court's exclusion of Kelly's proffered testimony constituted reversible error.

### C. *Recusal*

### 1. Standard of Review

■ Recusal of federal judges is governed by 28 U.S.C.A. § 455 (West Supp. 1989), which provides, in section 455(a), that a "judge ... shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Although 28 U.S.C.A. § 144 continues to provide for recusal upon affidavit submitted by a party, Congress rewrote section 455 in 1974 for the specific purpose of "broaden[ing] and clarify[ing] the grounds for judicial disqualification." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 2197, 100 L.Ed.2d 855 (1988). Under the new version of section 455, a judge is under an affirmative, self-enforcing obligation to recuse himself *sua sponte* whenever the proper grounds exist. Section 455 does away with the old "duty to sit" doctrine and requires judges to resolve any doubts they may have in favor of disqualification. *See United States v. Alabama,* 828 F.2d 1532, 1540 (11th Cir.1987), *cert. denied sub nom. Alabama State Univ. v. Auburn Univ.,* —— U.S. ——, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988).

"The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg,* 108 S.Ct. at 2205. Neither actual partiality, nor knowledge of the disqualifying circumstances on the part of the judge during the affected proceeding, are prerequisites to disqualification under this section. The duty of recusal applies equally before, during, and after a judicial proceeding, whenever disqualifying circumstances become known to the judge. *See id.* at 2202–03. The standard for recusal under section 455(a) is "'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt

about the judge's impartiality.' " *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir.1989) (quoting *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989)).

■ The standard employed by this Court in reviewing recusal decisions is whether the district court abused its discretion. *Giles v. Garwood*, 853 F.2d 876, 878 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989). The abuse of discretion standard has been described as allowing a range of choice for the district court, so long as that choice does not constitute a clear error of judgment. *See Kern v. TXO Production Corp.*, 738 F.2d 968, 970 (8th Cir.1984).

### 2. Application

■ We are unable to avoid the conclusion that the district judge committed a "clear error of judgment" by failing to recuse himself in this case. The judge expressed profound doubts about the propriety of continuing to sit on the case; indeed, he expressed near certainty that he should disqualify himself. Under *United States v. Alabama, supra,* such doubts should have been resolved in favor of disqualification. The judge provided a vivid description of the personal dilemma he felt. The judge's private conversation in chambers with Mrs. Wills, even though free of any actual or intended impropriety, is the type of circumstance especially likely to create the appearance of partiality. This appearance of partiality was further augmented by the judge's comment that Kelly

may have been abusing the recusal issue as his "ace in the hole," and by his subsequent repeated suggestions that he blamed Kelly for the "awkward position" in which he found himself. *See generally* Part II above. We need not speculate on whether the judge in this case felt actual ill-will or prejudice toward Kelly, or whether he was actually swayed by concern over public perceptions or the competing demands of friendship and marital harmony.[22] It is enough that the average layperson would have doubts about any judge's impartiality under these circumstances, regardless of what result was reached. *See Liljeberg*, 108 S.Ct. at 2202; *Torkington*, 874 F.2d at 1446.

■ The Government argues that Kelly waived any claim under section 455(a) because he declined to consent to a mistrial and expressed, through his attorney, a desire to "go ahead and leave it with the court." We disagree. Under 28 U.S.C.A. § 455(e), "[w]here the ground for disqualification arises only under [section 455(a)], waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." While it is thus permissible for a judge to accept a waiver of recusal, we believe this option should be limited to marginal cases and should be exercised with the utmost restraint.[23] We hold that, as a general rule, " 'a federal judge should reach his own determination [on recusal], *without calling upon counsel* to express their views.... The too frequent practice of advising counsel of a possible conflict, and asking counsel to indicate their approval of a judge's remaining in a particular case is fraught

**22.** The circumstances of this case do not require us to reach Kelly's argument that the judge's comments establish actual "bias or prejudice" under 28 U.S.C.A. § 455(b)(1). We are not persuaded by Kelly's attempt to analogize this case to *United States v. Holland,* 655 F.2d 44 (5th Cir. Unit B 1981). The facts of *Holland* were far more extreme; for one thing, the judge in that case explicitly acknowledged that he was increasing the defendant's sentence on reconviction because the defendant had supposedly "broken faith" with the judge by not objecting to the judge's entering the jury room during deliberations at the first trial and then successfully appealing his first conviction on that basis. *See id.* at 45–46. A showing of "pervasive bias and

prejudice" is required in order for "otherwise judicial conduct" to constitute a section 455(b)(1) violation. *See id.* at 47; *accord United States v. Killough*, 848 F.2d 1523, 1529 (11th Cir.1988). We doubt that Kelly has satisfied this standard in this case, and we find it sufficient to rest our conclusion on section 455(a).

**23.** An appropriate use of section 455(e), for example, might be when one or more parties become aware of marginal disqualifying circumstances unknown to the judge, and the parties present the judge with a joint agreement to waive recusal.

with potential coercive elements which make this practice undesirable.'" *Matter of National Union Fire Ins. Co.,* 839 F.2d 1226, 1231 (7th Cir.1988) (quoting Resolution L, Judicial Conference of the United States, October 1971) (emphasis added by Seventh Circuit); *see also Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.,* 579 F.2d 691, 699 (2d Cir.1978) ("Generally, a federal judge may not state for the record possible disqualifying circumstances and ask the parties to decide whether they want him to continue.").

▮▮▮▮▮ The district judge's delegation of the recusal decision to the parties was particularly inappropriate under the circumstances of this case. First, this was not a marginal case, as the judge's own comments illustrate. Second, it is clear from the record that the primary, if not the only reason the judge passed the issue to the parties was his concern that *sua sponte* recusal might bar retrial on double jeopardy grounds. Double jeopardy concerns are irrelevant to whether the standards for recusal under section 455 are met; therefore, the judge should not have considered that factor.[24] For the foregoing reasons, we

hold that Kelly did not validly waive his section 455(a) recusal claim.

▮▮▮ We also disagree with the Government's contention that Kelly's section 455(a) claim is barred for untimeliness. We noted in *Potashnick v. Port City Construction Co.,* 609 F.2d 1101, 1115 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980), that section 455 "imposes ... no duty on the parties to seek disqualification, nor any time limits within which disqualification must be sought." We have held, however, that a recusal issue may not be abused as an element of trial strategy. *Cf. id.;*[25] *accord Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1472 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987) (party may not lie in wait, knowing facts supporting a section 455(a) claim, and raise issue only after court's ruling on merits); *United States v. Slay,* 714 F.2d 1093, 1094 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984) (untimely section 455(a) claim need not be considered on appeal).

In both *Slay* and *Phillips,* the party seeking to raise the recusal issue knew all

---

**24.** Contrary to the judge's concerns, retrial would probably not have been barred in this case. Because this issue may recur in future cases, we find it appropriate to express our view that *sua sponte* recusal, when properly exercised according to any of the requirements of section 455, constitutes "manifest necessity" for declaring a mistrial under *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

It has long been established that retrial is barred by double jeopardy principles following a mistrial declared over the objections of the defendant, absent a showing of "manifest necessity." *See Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); *cf. id.* (retrial normally allowed where mistrial is "declared at the behest of the defendant"). In *Arizona v. Washington,* the Supreme Court held that a trial judge's declaration of mistrial because of prejudicial comments made to the jury by defense counsel satisfied the "manifest necessity" standard. The Court held: "In a strict, literal sense, the mistrial was not 'necessary.' Nevertheless, the overriding interest in the even-handed administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." 434

U.S. at 511, 98 S.Ct. at 833; *see also id.* at 513–14, 98 S.Ct. at 834–35 (noting that judge's firsthand familiarity with the trial "militat[es] in favor of appellate deference to [his] evaluation of the significance of possible bias"). *Accord Abdi v. Georgia,* 744 F.2d 1500, 1503 (11th Cir. 1984), *cert. denied,* 471 U.S. 1006, 105 S.Ct. 1871, 85 L.Ed.2d 164 (1985); *see also United States v. Cousins,* 842 F.2d 1245, 1247 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 139, 102 L.Ed.2d 111 (1988) (grant of mistrial based on possible jury prejudice "largely within the discretion of the district court").

These considerations apply even more strongly to the case at bar, which involves a judge acting as sole factfinder in a bench trial. The Court in *Arizona v. Washington* held that because the judge in that case exercised "'sound discretion' ..., the mistrial order is supported by the 'high degree' of necessity which is required in a case of this kind." *Id.* 434 U.S. at 516, 98 S.Ct. at 835. We hold, therefore, that where a trial judge properly exercises his discretion to recuse himself under section 455, "manifest necessity" is established for any resulting mistrial.

**25.** *Potashnick* avoided deciding the timeliness issue presented in that case. *See* 609 F.2d at 1115.

the facts supporting recusal well before the judicial proceeding took place. This case does not present such an abuse. While it appears that Kelly was aware for some time before trial that Wills and the judge had an indirect social relationship, the judge did not reveal until the next-to-last day of trial the intensity of his personal reaction to the dilemma he faced, the fact that he and his wife had argued over the issue, or the fact that he had spoken privately in chambers the day before with Mrs. Wills. Furthermore, the judge followed up on his "ace in the hole" comment by expressing, just prior to rendering the verdict and two weeks later in his April 22, 1988 order, his continued irritation at Kelly for not informing him about the potential conflict. The appearance of partiality was thus exacerbated even after the trial concluded.[26]

While this Court will not tolerate the abuse of recusal claims for purposes of trial strategy, we note that an overly rigid application of timeliness principles would effectively preclude appellate review of a judge's failure *sua sponte* to recuse himself *without* the prompting of a motion by either party. In *Potashnick*, 609 F.2d at 1115, we observed that the costs of disqualification "can be avoided in the future only if each judge fully accepts the obligation to disqualify himself in any case in which his impartiality might reasonably be questioned." We continue to expect that judges will heed that duty.

**3. Remedy**

■ On the question of the appropriate remedy for a judgment tainted by a section 455(a) violation, *Liljeberg, supra,* applied a

26. We note that the section 455(a) violation in this case is based not simply on the friendship between the judge's wife and Mrs. Wills as such, but also on the judge's expressed reaction to the problem during and after trial, and on the related events at trial.

27. In *Liljeberg,* the section 455(a) claim was not raised on appeal from the district court judgment tainted by the appearance of partiality. Rather, the losing party in the district court discovered the basis for the section 455(a) claim 10 months after the district court judgment had been affirmed on appeal and the litigation terminated. That party then moved under Fed.

form of "harmless error" analysis. *See* 108 S.Ct. at 2203. The Court held that vacatur and remand for retrial are potentially appropriate, depending on a consideration of three factors: (1) the risk of injustice to the parties in the particular case, (2) the risk that denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process. *See id.* at 2204.[27] We have no doubt that, at least under factors one and three, the district judge's abuse of discretion in failing to recuse himself from this bench trial constituted reversible error.

**IV. CONCLUSION**

For the reasons stated, the defendant's conviction is REVERSED on both counts.

Rule Civ.P. 60(b)(6) for relief from the final judgment. *See* 108 S.Ct. at 2197. Although the Court's reasoning in *Liljeberg* would appear to apply equally to reversal of a final judgment on appeal, the Court noted that Rule 60(b)(6) has traditionally been applied only in "extraordinary circumstances." *Id.* at 2204 n. 11. Thus, the standard for reversal on appeal in cases involving section 455(a) violations may not be as stringent as the three-part test enunciated in *Liljeberg.* We need not decide that question, however, because this case clearly falls within the *Liljeberg* standard.