921 So.2d 725 (2006)
Cecelia W. HARRIS d/b/a C.W. Harris Bus, Leon C. Harris, d/b/a L.C. Harris School Bus, Renee Harris d/b/a Renee Harris School Bus, Robin Harris d/b/a Robin Harris School Bus, Ruth Harris d/b/a M.C. Harris Bus Service, Inc., Janice Johnson d/b/a J.R. Johnson Bus, Inc., Appellants,
v.
SCHOOL BOARD OF DUVAL COUNTY, Florida, Appellee.
No. 1D05-0984.
District Court of Appeal of Florida, First District.
February 17, 2006.
*726 Albert H. Mickler, Esquire of the Law Offices of Mickler & Mickler, Jacksonville, for Appellants.
William R. Mabile, III, Esquire and William D. Horgan, Esquire of Fuller, Johnson & Farrell, P.A., Tallahassee, for Appellee.
BENTON, J.
Plaintiffs below, former school transportation contractors who sought to recover damages as partial reimbursement for moneys they expended to purchase school buses, appeal the trial court's grant of summary judgment against them and in favor of the Duval County School Board. We affirm.
For decades, rather than buying its own school buses and hiring its own school bus drivers, the School Board has contracted with individuals and other private entities to transport students to and from schools. Deposition testimony dated the first of such contracts to shortly after World War II, when the School Board asked people to purchase buses and provide student transportation on a contract basis, so the School Board would not have to buy several buses at once itself.
*727 This initial decision led to a succession of annual contracts between individual transportation contractors and the School Board,[1] contracts which were renegotiated and entered into anew each school year. By contracting year after year, deposition testimony indicated, at least one appellant had been providing bus transportation services to the School Board from the start of the 1957-1958 school year until the 2000-2001 school year came to a close, and with it the era in which school transportation contracts were let without competitive bidding. None of the appellants was awarded a contract for the 2001-2002 school year.

I.
After taking office in August of 1998, a new superintendent convened a special task force to review the cost efficiency of the School Board's bus transportation program. Among other things, the task force recommended implementing a competitive bidding procedure to ensure the School Board got the lowest price for transportation services. The report also projected cost savings, estimating that using "national contractors" could save the School Board between three and seven million dollars a year.
The School Board then requested an opinion from the City of Jacksonville's office of the general counsel as to whether the School Board was required by law to bid the school transportation contracts competitively. The office of the general counsel rendered an opinion on April 17, 2000, that school transportation contracts were not exempt from competitive bidding requirements.
Accordingly, the School Board implemented a competitive bidding process for the 2001-2002 school year, dividing the county up into five geographic areas for purposes of competitive bidding.[2] The local contractors were too small to bid on contracts to provide such extensive transportation services on their own, but some of the local contractors combined to make consolidated bids. In the aggregate, bids submitted by entities comprised of former local bus transportation providers were millions of dollars higher than their competitors'. Not one combination of former local bus transportation contractors submitted a winning bid.

II.
Each of the contracts the appellants had last signed, entitled "2000-2001 Contract for Transportation of School Children," took effect "the 1st day of July, 2000" and expired "June 30, 2001." Designated "Contractor" in the form agreement, each appellant undertook to operate approved buses on assigned routes. The contracts provided:
The Contractor shall transport public school students by bus, for the period of time hereinafter specified, over an assigned route(s), and for other approved school transportation needs as may be required. No specific route(s) shall be *728 guaranteed to any Contractor at any time.[3]
The contracts required each appellant to operate buses on a specific time schedule, provided by the School Board's Department of Transportation,[4] and to keep records of the trips.

A.
Contractors had to register all bus drivers with the transportation office. Each driver had to be licensed, and had to keep licensing and certain other information on file in the transportation office. Bus drivers had to be approved by the Superintendent of Schools, and the contractor had to require drivers to attend safety and training meetings required by the Superintendent.
The contracts established requirements for the buses, including inspections. No bus provided by a contractor was allowed to transport students until the bus was approved by the Superintendent of Schools (or his designee). Each contractor had to see that the bus was inspected monthly. The contracts provided:
Failure of a bus to pass inspection, or any safety or any mechanical failure that requires the removal of the bus from service,[[5]] and when not replaced by the Contractor's own backup bus or a bus approved by the Director of Transportation, or his designee, shall result in a pro rata deduction and loss of compensation to the Contractor for the period of time the bus is out of service.
All buses were subject at all times to inspection by the Superintendent. The contracts required each contractor to procure workers' compensation coverage, and required the School Board to procure automobile liability insurance coverage for bodily injury and property damage in specified amounts.
The contracts addressed student discipline, and conferred on bus drivers the same powers of control as teachers, except that drivers were not allowed to punish school children. (The bus driver had to report misbehavior to the principal.) Section "L" of the contracts was devoted to the employment of bus attendants.
No one had authority to modify the contracts except the School Board by order. The contractor was not free to sell, assign or transfer a contract without prior written consent of the School Board: a contract would have terminated if it had been *729 sold, assigned or transferred without the School Board's consent. If assigned with the School Board's consent, all rights and obligations under the contract would have survived the assignment intact.
The contracts allowed the School Board to suspend a contractor for failure to comply with any of the contract terms, or in the event a contractor was charged with a felony or with any misdemeanor that seriously affected the best interests of the School Board. If any contractor had actually been convicted of a felony, the contract was to have been terminated. Even conviction of a misdemeanor could have supplied grounds to terminate the contract.
The contracts allowed the School Board to cancel outright if it discontinued a bus route to consolidate routes, close a school, or discontinue a grade, class, or program. Additionally, the School Board could terminate the contract if it discovered that the contractor had made false representations or concealed a material fact in connection with the contract, or if the contractor refused, without good cause, to take any additional trip to or from the assigned school. If a contractor failed to fulfill contractual obligations, the contractor forfeited all right to payment.

B.
Section "I" of the contracts addressed compensation owed to the transportation contractors in detail, as follows:
(1) The Contractor shall receive compensation on a 20 [school] day pay cycle basis for the transportation of students in accordance with the rates set forth in Appendix A, attached hereto, for all services hereunder which have been properly approved.
(2) In addition, the Board shall provide a bus replacement allotment of nine (9) payments (one per pay cycle, commencing in September) in the amount set forth in Appendix B for each bus of the year of manufacture indicated. It is the intention of the Board that its first priority in future compensation will be to fund the bus replacement schedule by adding a new year at the top of the schedule and drop buses which are older than ten (10) years from the schedule for payment. The schedule is intended to reflect increased cost, if any, of new buses purchased from the State of Florida school bus bid pool at the prevailing average rate of interest for purchase of buses through Duval County financial institutions. Payment of the bus replacement allotment shall begin on the day a bus enters into active service, and partial payments shall be calculated on a pro rata basis for the pay period in which the bus is brought into service. ALL CHANGES IN BUSES FROM THOSE SPECIFICALLY CONTRACTED FOR DURING THE 2000-2001 SCHOOL YEAR MUST BE APPROVED, IN ADVANCE, BY THE DIRECTOR OF TRANSPORTATION. It is the further intention of the Board that all regular school buses shall be replaced on no more than a thirteen-year replacement cycle,[[6]] except as *730 otherwise provided for special classifications of buses .... This replacement schedule is to be fully implemented at the beginning of the 2000-2001 school year (See Schedule "C-2"). Adjustments for payment of 2000 model buses shall be made at the beginning of the 2000-2001 school year, even if purchased during the 1999-2000 school year. Model 2000 buses brought into service during the 2000-2001 school year shall be paid as 2000 model buses for the remainder of the 2000-2001 school year. The year of the model shall be as recorded on the bus title.
(3) If the Director of Transportation, or his designee, requires a bus to return to a school to pick up a student through no fault of the driver, the Contractor will be paid twenty dollars ($20.00)....
The final paragraph of the contract reads: "This contract shall be effective for the period of time beginning July 1, 2000 and ending June 30, 2001."
Appendix "A" set "basic capacity rates" for different types and sizes of buses. It provided that an insurance premium of $153 would be deducted monthly and that fuel expense would be reimbursed at market price; established the amount of compensation for over-mileage, partial runs, activity runs, back-up buses, field trips, and modified programs; set the amount the contractor would receive to cover the salary of each authorized bus attendant; and established a time limit in which contractors had to apply for payment.
Appendix "B" is a chart entitled "Allotted for School Bus Replacement 2000-2001." The chart reads:

Model Per Bus Per Bus
Year Per Year Per Month
1991 450.00 50.00
1992 540.00 60.00
1993 630.00 70.00
1994 720.00 80.00
1995 810.00 90.00
1996 1530.00 170.00
1997 1530.00 170.00
1998 1530.00 170.00
1999 1530.00 170.00
2000 1530.00 170.00

(Asterisks omitted.) Testimony characterized these payments as "incentives" for contractors to purchase new buses.

III.
The appellants filed in circuit court on January 29, 2002, alleging breach of contract.[7] In their first amended complaint, they claimed that custom and practice entitled each bus contractor to compensation from the School Board for providing a bus (and operator) for each assigned route, and that the contractors should receive compensation for buses over a term equal to *731 the "replacement life" of each bus assigned to a route. They alleged that the written contracts were not integrated agreements, but supplemented oral contracts and gave meaning to the terms of the oral contracts. The first amended complaint alleged, in essence, that custom and practice reflected the parties' mutual understanding that the School Board would pay for their buses, and that the School Board had breached these unwritten contracts by terminating unilaterally.
After discovery, the School Board filed a motion for summary judgment on grounds that the parties' written contracts governed, and unambiguously provided for expiration on June 30, 2001. The School Board maintained that, when the contracts expired on June 30, 2001, all contractual obligations had been discharged, and that it had no duty to enter into new contracts with the appellants for transportation services. The School Board argued that the written contracts were integrated agreements that specified a definite ending date, and should be given effect.
The appellants responded that the written contracts were ambiguous, and that other evidence should be looked to for the parties' intent. They specifically pointed to what they called an "inclusion clause," set out supra note 4, and to the contracts' reference to amounts allotted for school bus replacement, specifically Appendix "B", which lists bus model years and corresponding incentive payment amounts. They argued that the language of the contracts referring to "future" funding and incorporation of Appendix "C" created ambiguity by evidencing an intent to continue the parties' relationship after the contracts expired.
On June 5, 2003, the trial court granted the School Board's motion for summary judgment, ruling:
Testimony and evidence presented at the hearing on the Motion for Summary Judgment revealed that this school bus transportation contract was renewed yearly through private negotiations, and that beginning in the school year 2001-2002, the Duval County School Board began soliciting school bus contractors through the State-mandated competitive bidding process. Evidence also revealed that the contract required Plaintiffs to purchase buses on a replacement schedule that existed well beyond the contract's effective period of one year. As such, Plaintiffs, based on prior practices, spent a considerable amount of money to comply with the bus replacement requirement as specified by the contract. However, this Court finds that based on the clear terms of the contract that it expired on June 30, 2001.
While granting summary judgment on the first amended complaint, however, the trial court allowed appellants thirty days to amend anew.
In their second amended complaint, the appellants alleged breach of an implied covenant of good faith and fair dealing, claiming that prior to the 2000-2001 school year, the School Board had indicated it would continue its past policies relating to transportation contracts in force. The School Board filed a motion to dismiss the second amended complaint on grounds that no claim for breach of implied covenant of good faith could be maintained absent an allegation that an express term of the contract had been breached by the School Board. See Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1098 (Fla. 1st DCA 1999) ("[T]he implied obligation of good faith cannot be used to vary the express terms of a contract."); Ament v. One Las Olas, Ltd., 898 So.2d 147, 149 (Fla. 4th DCA 2005) ("[A] duty of good faith must relate to the performance of an express term of the contract and is not an *732 abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.") (quoting Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc., 710 So.2d 573, 575 (Fla. 4th DCA 1998)). The trial court granted the School Board's motion to dismiss the second amended complaint, but did so without prejudice to the appellants' filing still another complaint.
The appellants filed a third amended complaint on November 14, 2003, again alleging breach of contract and breach of implied covenant of good faith and fair dealing, but also alleging new theories, including promissory estoppel. On motion addressed to the third amended complaint, the trial court dismissed all counts, except for the promissory estoppel count. This count alleged that School Board representatives orally promised appellants that the School Board would use their buses until they needed replacement; that the appellants had reasonably relied on these promises to their detriment when they purchased the buses; that the School Board benefitted from this arrangement; and that the appellants did not have any other adequate remedy.
The School Board filed a motion for summary judgment on the one surviving count, the promissory estoppel claim, arguing that the School Board itself never made any promises to the appellants; that reliance on any promises employees may have made was unreasonable as a matter of law; and that the payments purportedly promised would have been illegal, absent competitive bids. The School Board argued that appellants' actual knowledge that the contracts for 2001-2002 were going to be competitively bid was not in dispute; that promissory estoppel was not available because there was an express written contract; and that the claim was barred both by the statute of frauds and by the doctrine of sovereign immunity.
In entering final summary judgment for the School Board, the court ruled no evidence supported the claim that the School Board had promised to reimburse appellants for the cost of school buses the appellants purchased; and that, to the extent that lower-level employees of the School Board attempted to make such promises, any reliance by the appellants on their promises was unreasonable as a matter of law because appellants knew, or should have known, that fulfillment of such promises would unlawfully foreclose competitive bidding.
The court ruled that promissory estoppel could not alter the terms of the parties' written contracts, which made no mention of reimbursement for the buses. The court also ruled that, even if promissory estoppel were otherwise available, it could not be invoked in this case because doing so would create, not remedy, an injustice; and because promissory estoppel can not be used to circumvent the statute of frauds. The trial court also ruled the doctrine of partial performance inapposite because appellants had simply purchased "tools of the trade" when they bought buses, to enable them to perform services for which they were fully compensated by payments under written contracts.

IV.
On appeal, the arguments for reversal are twofold. Appellants contend they should have been permitted to go to the jury on their theory that the School Board breached putative contracts that did not track the written contracts the parties executed. They also argue that they were entitled to a trial on the theory of promissory estoppel they stated for the first time in their third amended complaint.

*733 A. Breach of Contract
The appellants argue, in essence, that separate and divisible contracts, distinct from, if not entirely different than, the lengthy written contracts they each executed, entitled them to continued payments, notwithstanding the written contracts' expiration provisions[8]and notwithstanding cessation of the appellants' services as school transportation contractors. Otherwise stated, they argue first that an ambiguity in the written contracts required considering other evidence of the parties' intent regarding the termination of the School Board's contractual obligations. Then, on this premise, they assert that they identified evidence which should have precluded summary judgment on their claim that the School Board has an ongoing obligation to make payments related to the cost or value of the school buses that the contractors purchased to perform the school transportation contracts.
We find no ambiguity in the contracts in the present case regarding the date the School Board's obligation to make payments ceased, viz., June 30, 2001. Unless an ambiguity exists because contractual terms cannot be reconciled, a court need not (and should not) look to extrinsic sources to determine the parties' intent. See Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So.2d 1135, 1139 (Fla.1998); see also Dune I, Inc. v. Palms N. Owners Ass'n, Inc., 605 So.2d 903, 905 (Fla. 1st DCA 1992); Thrasher v. Arida, 858 So.2d 1173, 1175 (Fla. 2d DCA 2003). Where the language of a contract is unambiguous, there is no occasion for judicial construction. Clear contract language controls. See Dune I, 605 So.2d at 905; Thrasher, 858 So.2d at 1175. Courts should first try to reconcile apparently conflicting contract clauses. See Thrasher, 858 So.2d at 1175. Only where a contract contains mutually repugnant clauses that actually conflict does an ambiguity exist.
The appellants argue that the written contracts are ambiguous as to expiration mainly because of a stated "intention":
In addition, the Board shall provide a bus replacement allotment . . . . It is the intention of the Board that its first priority in future compensation will be to fund the bus replacement schedule by adding a new year at the top of the *734 schedule and drop buses which are older than ten (10) years from the schedule for payment.
(Emphasis added.) But this vague, aspirational language can easily be reconciled with the one-year term of the contract.
If anything, the emphasized language put them on notice that the scheduled incentive payments might not have been funded, even if the parties had entered into transportation contracts in succeeding years. While the language expresses the School Board's intention to make the schedule's continued funding "its first priority in future compensation," it makes no promise that any contract will be renewed, or that the School Board will contract with any particular transportation contractor in the future. The language in question is fully compatible with the clearly stated, limited duration of these one-year contracts, and does not require resort to parol evidence.
Equally fundamentally, nothing in the contract language or evidence lends support to the appellants' hypothesis that the bus replacement incentive schedule is divisible from the remainder of the contract. The School Board contracted for certain services, and the school transportation contractors agreed to provide them. Under the parties' agreements, if a school transportation contractor failed to take students to and from school as agreed, the contractor did not receive compensation of any kind.
The appellants all testified that they were promised only the right to continue to provide transportation services, not some entitlement to payments for buses that were no longer used for school transportation. No evidence supported a contrary view. Ms. Renee Harris herself testified that the school bus replacement allotments were an incentive to transport school children in newer buses, an incentive that did not give rise to any right to compensation apart from contractually defined compensation.
Under no view of the evidence was there an undertaking by the School Board to pay for the contractors' buses. New school buses cost between $55,000 and $70,000, the evidence showed, while the maximum bus replacement incentive payment amounted to a mere $1530 per year. Plainly, the School Board never agreed to buy the contractors' buses.

B. Promissory Estoppel
Pleading in the alternative, as they were entitled to do, see Doe v. Univision Television Group, Inc., 717 So.2d 63, 65 (Fla. 3d DCA 1998) ("[W]e ... hold that plaintiff may plead the contract and promissory estoppel claims in the alternative."), the school transportation contractors eventually stated a promissory estoppel claim. For purposes of this claim, they took the position that, while no contract required any reimbursement for buses, School Board employees had orally promised the contractors they would be reimbursed for buses they had purchased. They alleged that they had reasonably and detrimentally relied on such promises and that an injustice could be avoided only by enforcing the promises against the School Board. See W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc., 728 So.2d 297, 302 (Fla. 1st DCA 1999) ("To state a cause of action for promissory estoppel, a plaintiff must allege facts that, if taken as true, would show 1) that the plaintiff detrimentally relied on a promise made by the defendant, 2) that the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of the plaintiff or a third person, and 3) that injustice can be avoided only by enforcement of the promise against the defendant.").
*735 But appellants point to no evidence of a promise to reimburse the cost of any bus, apart from making payments specified in the written contracts. The appellants' Initial Brief gives the following language from Cecelia Harris' affidavit as an example of the promises on which appellants rely:
I would meet with Gene Blackwood, the director of transportation.... I would discuss the purchase of equipment and the bus for the assigned bus route. I would discuss the cost of reimbursement with Mr. Blackwood.... When the assigned route was discussed with Mr. Blackwood or one of his assistants, I would ask how these bus purchase requirements and other equipment requirements would be paid. Mr. Blackwood said that I would be working on that route long enough that the bus and equipment would pay for itself.

(Emphasis added.) Putting to one side the question of Mr. Blackwood's authority to speak for the School Board or his ability to bind the School Board orally, see generally County of Brevard v. Miorelli Eng'g, Inc., 703 So.2d 1049 (Fla.1997), the language Ms. Harris attributed to him contemplated nothing more than compensation for transportation services in accordance with the terms of the written contracts.
Reliance on any promise to make payments not called for by the comprehensive, integrated written contracts (or on any oral promise to renew the written contracts indefinitely)[9] would not, moreover, be reasonable as a matter of law. A contract entered into in violation of statutes and rules[10] requiring competitive bids "is absolutely void, and ... no rights can be acquired thereunder by the contracting party." Wester v. Belote, 103 Fla. 976, 138 So. 721, 724 (1931). A person who contracts with the government is presumed to know the law, including whether a particular contract requires competitive bidding. See Armco Drainage & Metal Prods., Inc. v. County of Pinellas, 137 So.2d 234, 236 (Fla. 2d DCA 1962).
Competitive bidding requirements are designed to protect the public from collusive contracts and from the ill effects of official favoritism in public procurement; and to ensure fair competition among bidders for the public good. See Wester, 138 So. at 724. The Second District Court of Appeal has explained:
Where two persons with equal knowledge and equally participating in the fault, have entered into an illegal agreement, one of them has obtained by the other's voluntary act all the benefit of it for himself, his refusal to perform his own part is, generally considered in itself alone, unjust and inequitable; but the law sustains him in this position, because it takes into account the interests of society and of the state, which demand the complete suppression of such agreements.
Armco, 137 So.2d at 238 (quoting Schaal v. Race, 135 So.2d 252, 257 (Fla. 2d DCA *736 1961)); see also Mayes Printing Co. v. Flowers, 154 So.2d 859, 864 (Fla. 1st DCA 1963) ("The law is clear that competitive bidding statutes are designed to secure fair competition on equal terms for all bidders, among other things to avoid favoritism and to secure public improvements at the lowest reasonable cost to the taxpayers.") (quoting with approval the trial judge's opinion).
Affirmed.
ALLEN and VAN NORTWICK, JJ., concur.
NOTES
[1] The School Board did not meet with each contractor individually. Instead, agents of a group representing all of the transportation contractorsthe Duval County Bus Contractors Associationmet with School Board representatives and negotiated the terms of the contracts for the upcoming school year. After negotiations produced a form contract, each contractor and the School Board signed a copy, agreeing to be bound by the terms the School Board and the Association had negotiated for the succeeding school year.
[2] The School Board's original plan was to implement competitive bidding after the 1999-2000 school year, but the School Board put it off for a year at the request of its local transportation contractors to allow them extra time to prepare for the competitive bidding process.
[3] Another section of the contracts dealt with how bus routes were to be assigned, and provided that only the Director of Transportation or his designee could change a route. It also provided that, if a bus contractor ceased to do business with the School Board, the routes that were assigned to that bus contractor would be offered to existing contractors first on the same terms and conditions.
[4] The contracts provided:

All specifications, documents and conditions heretofore filed in the transportation office pertaining to the transportation of school children and each instrument executed by, or on behalf of, the Contractor pursuant to said specifications, documents and conditions are hereby made a part of this contract to the same extent as if set forth herein, anything herein to the contrary notwithstanding.
[5] Another contract provision explained what constituted "satisfactory performance" of the bus and provided:

Repeated failure of a bus to perform satisfactorily, in any way, due to mechanical deficiencies, unauthorized adjustments to a route, or using an improper or non-approved bus on a route at a time and in a manner not approved by the Director of Transportation, or his designee, may result in a requirement to replace the bus, as determined solely by the Superintendent, or his designee. If the bus is not replaced, then the entire contract may be terminated, according to the provisions of Section (B), Paragraph (8) of this contract.
[6] Appendix "C" reads as follows:

A. It is understood that the Board approved for the 2000-2001 school year a twelve (12)-year replacement cycle for buses in all Florida Department of Education school bus body classifications, other than "D" class and certain 1988 models with prior approval from the Duval Transportation Department. The 2000-2001 school year bus replacement schedule will be implemented according to the following schedule.:
By July 1, 2000:
All 1989 and newer models approved for "Regular Status Service" and certain 1988 models with prior approval from the Duval Transportation Department.
All 1986-78 models approved for "Spare Bus Status Only" service during the 2000-2001 school year.
B. All buses approved as "D" body classification by the Florida Department of Education and placed on "A" use status by the Duval County School Board will be replaced on a fifteen (15)-year replacement cycle. Thereafter, they may be used for "Contractor Spare" bus purposes for two years beyond the normal replacement cycle.
[7] Other lawsuits were filed alleging breach of other school transportation contracts in Duval County. On April 3, 2003, the trial court denied a motion by the School Board to consolidate all of these cases, noting that each of the other cases was "currently abated" except for mediation purposes.
[8] Appellants' argument flies in the teeth of the Statute of Frauds, section 725.01, Florida Statutes (2001), which provides that "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof, . . . unless the agreement or promise . . . [is] in writing . . . ." The purpose of the statute of frauds is to "intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos." Tanenbaum v. Biscayne Osteopathic Hosp., Inc., 190 So.2d 777, 779 (Fla.1966) (quoting Yates v. Ball, 132 Fla. 132, 181 So. 341, 344 (1937)).

We are not concerned in the present case with a contract of indeterminate length capable of being fully performed within one year. See generally Byam v. Klopcich, 454 So.2d 720, 721 (Fla. 4th DCA 1984). Appellants alleged an oral contract requiring payments over a period of more than one year. Any such contract would fall within the purview of the statute of frauds, and be deemed invalid as a matter of law. See Yates v. Ball, 132 Fla. 132, 181 So. 341, 344 (1937).
Acknowledging the duration of the oral contract they allege, appellants argue that they fall within the exception the statute of frauds recognizes for part performance: If one party to an oral contract discharges its obligations under the contract, the statute of frauds does not countenance the other party's accepting the benefits of the agreement while walking away from its own undertakings. See Burke v. Napieracz, 674 So.2d 756, 758 (Fla. 1st DCA 1996). Here, however, the School Board has paid all it owes for transportation services furnished on or before June 30, 2001, and appellants do not allege that they performed any services after that date.
[9] The doctrine of promissory estoppel cannot be used to circumvent the statute of frauds. See Tanenbaum, 190 So.2d at 778-79.
[10] Rule 6A-1.012(6) of the Florida Administrative Code (2001) states: "Except as authorized by law or rule, bids shall be requested from three (3) or more sources for any authorized purchase or contract for services exceeding the amount established in Section 287.017, F.S., for purchasing category two." See also § 287.057(1), Fla. Stat. (2001) ("Unless otherwise authorized by law, all contracts for the purchase of ... contractual services in excess of the threshold amount provided in s. 287.017 for CATEGORY TWO shall be awarded by competitive sealed bidding."). In 2001, the category two purchasing threshold amount was $25,000. See § 287.017(b), Fla. Stat. (2001). An individual contract for bus transportation services is more than $25,000.