[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 12-13249, 14-10989
_____

D.C. Docket No. 3:11-cv-00060-MCR-CJK


COMMUNITY MARITIME PARK ASSOCIATES INC.,

Plaintiff - Counter Defendant - Appellee,

versus

MARITIME PARK DEVELOPMENT PARTNERS LLC,

Defendant - Counter Claimant - Appellant.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(March 25, 2015)

Before MARCUS, JILL PRYOR and EBEL,[*] Circuit Judges.

PER CURIAM:

_____

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

This appeal arises from an action to rescind the Development Agreement ("Agreement") signed by Community Maritime Park Associates, Inc. ("CMPA") and Maritime Park Development Partners, LLC ("MPDP") on August 14, 2009 after a competitive award process that CMPA alleges suffered from procedural defects.  MPDP appeals four district court orders:  (1) denial of a motion to recuse, (2) a grant of partial summary judgment to CMPA, (3) a disgorgement order, and (4) a preliminary injunction freezing certain of MPDP's assets.  After careful review, and with the benefit of oral argument, we affirm.[1]

I.

CMPA is a non-profit organization created by the City of Pensacola, Florida, to oversee the city's Community Maritime Park project, a mixed-use development originally designed to include a public park, a sports venue, a conference center, and other commercial, residential, and retail facilities.  MPDP, a corporation formed after CMPA had begun its competitive award selection process for a "Master Developer" for the project, won the contract by representing itself as a joint venture that included one of the original candidates for Master Developer, Land Capital Group, Inc. ("Land Capital").

In conducting its search for the Master Developer, CMPA sought to comply with Florida competitive award statutes that govern the negotiation of public

---

[1] After oral argument, MPDP moved to certify a series of questions to the Florida Supreme Court.  We deny that motion as moot.

2

contracts.  Florida's Consultants' Competitive Negotiation Act ("CCNA"), Fla

Stat. § 287.055, sets forth a rigid process for government agencies to follow when

procuring professional services for urban development.[2]  The first two stages of the

process include (1) an announcement and request for qualifications ("RFQ") and

(2) a request for proposals ("RFP") from firms that qualified through the RFQ

stage.  *Id.* § 287.055(3), (4).  Then, the government agency must rank at least three

firms based on their RFPs and begin contract negotiations with the top-ranked

firm.  *Id.* § 287.055(4)(b), (5).  Upon completing the RFQ and RFP stages, CMPA

identified Land Capital as the top-ranked firm for subsequent negotiations.  By the

RFP stage, however, Land Capital had begun to lose its financial footing.  To

reassure CMPA of the integrity of the firm's proposal, Land Capital principal Scott

Davison represented to CMPA that MPDP was a financially sound joint venture

between Land Capital and other real estate firms that would step in to take the

reins.[3]  On the basis of these representations, MPDP won the contract as the

successor to Land Capital's bid even though MPDP was not officially a candidate

during the RFQ or RFP stages.

---

[2] It is undisputed that CMPA, an agent and instrumentality of the City of Pensacola that operates out of City office space, must comply with the CCNA when undertaking a qualifying project on behalf of the City.  *See* Fla. Stat. § 287.055(2)(b) (defining "[a]gency" to include "municipalit[ies]").

[3] Although Land Capital formally submitted a proposal in response to the RFP, the proposal identified MPDP as a "joint venture" that would be primarily responsible for the project.  Doc. 170-7 at 1, 2, 53.

3

The resulting Agreement named MPDP as the Master Developer and also gave CMPA the option to hire MPDP as its "Design-Build Contractor."  Doc. 18-1 at 24.  The CCNA defines a design-build contract as "a single contract with a design-build firm for the design and construction of a public construction project." Fla. Stat. § 287.055(2)(i).  Where a developer is qualified under Florida law to handle both design and construction, this option creates an opportunity for efficiency and cost savings.  CMPA initially voted to award the design-build contract to MPDP, but MPDP was unable at that time to secure the bonding it needed.  Thus, MPDP recruited Hoar Construction, LLC ("Hoar") to create a new entity, Magi Construction, LLC ("Magi"), in which MPDP would take a 49-percent share in exchange for assigning its right to the design-build contract to Magi.

Well after development began, CMPA learned that MPDP had never in fact formed a legal relationship with Land Capital.  As a result, CMPA fired MPDP in a public meeting on January 14, 2011 and sued in state court to rescind the Agreement, arguing that MPDP had obtained the award in violation of the CCNA. MPDP removed the action to federal court.  Ruling on cross-motions for summary judgment, the district court granted partial summary judgment to CMPA after concluding that the Agreement was void for violation of the CCNA.  A trial was necessary only to determine whether MPDP had an equitable defense to the default

4

remedy of disgorgement.  The court issued a preliminary injunction freezing assets accruing to MPDP under the design-build contract to preserve funds for that remedy if necessary.[4]  MPDP immediately appealed the injunction order.  After a bench trial on MPDP's equitable defense of good faith, the district court concluded that MPDP had not acted with good faith and that disgorgement was appropriate in the amount of $1,624,066.57.[5]  MPDP then appealed from the final judgment, and we consolidated that appeal with the interlocutory appeal of the preliminary injunction.

## II.

A few weeks after MPDP removed the instant action to federal court, MPDP moved for the district court judge, M. Casey Rodgers, to recuse herself on the basis of her relationship to Judge Lacey Collier, a district judge in the same courthouse who was chairman of CMPA when it negotiated the Agreement.  Judge Collier signed the Agreement on CMPA's behalf during his tenure as chairman and subsequently made several negative public statements about Scott Davison.  MPDP cited in support of its motion the facts that Judge Rodgers clerked for Judge

---

[4] The injunction followed an initial partial summary judgment order that held only part of the Agreement to violate the CCNA.  Upon cross-motions for reconsideration of that order, however, the court issued a second partial summary judgment order holding the whole contract void under the CCNA.

[5] This number reflects the sum of MPDP's development fee, its profits from the design-build contract, and other incidental benefits that it retained while serving as a pass-through for project funding.

Collier, was a magistrate judge under his supervision, and later filled his seat on the district court when he took senior status. Notably, MPDP did not articulate any expectation that either party would call Judge Collier as a witness in the action. Judge Rodgers denied the motion, and MPDP now appeals from that order.[6]

Title 28 U.S.C. § 455(a) places a judge "under an affirmative, self-enforcing obligation to recuse [her]self *sua sponte* whenever the proper grounds exist." *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989). A district court ruling on a recusal motion under § 455(a) must decide "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality . . . ." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988)). This Court reviews a decision not to recuse under an abuse-of-discretion standard, for "a clear error of judgment." *Kelly*, 888 F.2d at 745. In deciding whether to vacate the judgment, we may consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the

---

[6] After briefing concluded, CMPA filed a partial motion to dismiss the appeal as to the recusal issue on the basis that MPDP failed to reference the order denying recusal in either notice of appeal that it filed. That motion is denied. MPDP properly appealed from the order because "appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment." *Toomey v. Wachovia Ins. Servs., Inc.*, 450 F.3d 1225, 1228 n.2 (11th Cir. 2006) (internal quotation marks omitted).

6

risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).

We cannot say that Judge Rodgers's decision not to recuse herself reflected a clear error of judgment. MPDP moved for recusal at an early stage in the case, when the court could not have known that Judge Collier would serve as a witness in any proceeding. Further, assuming *arguendo* that it was error for Judge Rodgers to decline to recuse herself, any error would not be reversible because no injustice resulted from the decision. *See id.* The only order referencing Judge Collier's testimony is the one resolving the bench trial on MPDP's equitable defense of good faith and setting the amount of disgorgement. We acknowledge that Judge Collier's testimony included his own character judgment of an MPDP representative and was relevant to the central question of good faith. Still, MPDP itself was responsible for introducing that testimony, and thus we are unwilling to conclude that MPDP would be prejudiced by Judge Rodgers's propensity to believe Judge Collier. Further, there is enough evidence of MPDP's misrepresentations to CMPA to provide a substantial basis for Judge Rodgers's disgorgement order apart from Judge Collier's testimony. *See infra* Part IV. The district judge did not commit reversible error in declining to recuse herself.

III.

7

"We review *de novo* the district court's partial grant of summary judgment, and apply the same legal standards as the district court and view all facts and reasonable inferences in the light most favorable to the non-moving party." *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013) (alteration omitted).  The central fact relevant to the summary judgment decision is largely undisputed:  although MPDP was the entity that entered into the Agreement with CMPA, MPDP did not participate in the full RFQ/RFP process outlined by the CCNA.  Regardless, MPDP argues that the district court should not have ruled the Agreement void under the CCNA for one of three reasons:  (1) the CCNA did not apply; (2) even if the CCNA did govern the Agreement, there was no violation of the statute; or (3) if there was a violation, then CMPA waived it by accepting the Agreement.  We reject each of these arguments and affirm the partial summary judgment order.

### A.

The CCNA outlines competitive selection and negotiation procedures that a local government must employ when certain public contracts involve the procurement of "[p]rofessional services," which the statute defines as "services within the scope of the practice of architecture, professional engineering, landscape architecture, or registered surveying and mapping" and related incidental services.  Fla. Stat. § 287.055(2)(a).  The district court found that the Agreement was such a

contract and reviewed the process leading up to the execution of the Agreement for compliance with the CCNA.  MPDP argues that the district court should not have applied the CCNA to the search for a Master Developer—a general contractor that would subcontract with qualified firms to provide professional services—because any services falling under the statute would be performed by subcontractors.

We agree with the district court that the plain meaning of the CCNA precludes this argument.  The CCNA defines "[p]roject" as any "fixed capital outlay study or planning activity" subject to the public announcement procedures described in paragraph (3)(a).  *Id.* § 287.055(2)(f).  Paragraphs (3)(a)-(d) lay out the announcement and qualification procedures required on "each occasion when professional services must be purchased for a project . . . ."  *Id.* § 287.055(3).  The competitive selection and negotiation procedures outlined thereafter are required for "each proposed project . . . ."  *See id.* § 287.055(4)(a).  Thus, the statute is clear that anytime "professional services must be purchased for a project[,]" a government agency must employ the full process outlined by the CCNA, even if subcontractors provide those services.  CMPA's reliance on a general contractor to bring together the parties providing professional services did not change the fact that professional services were necessary to the project.  *See City of Lynn Haven v. Bay Cnty. Council of Registered Architects, Inc.*, 528 So. 2d 1244, 1246 (Fla. Dist. Ct. App. 1988) (finding that use of a general contractor does not excuse a city's

noncompliance with the CCNA). Accordingly, the Agreement was subject to the CCNA.[7]

## B.

The claim at the core of CMPA's action is that MPDP improperly substituted itself for Land Capital late in the CCNA-mandated process, once Land Capital became insolvent. The CCNA makes clear that the competitive negotiation procedure—the final stage in the process—must proceed based on the results of the earlier stages. Fla. Stat. § 287.055(5)(a) (requiring an agency to negotiate with "the most qualified firm[,]" which plainly refers to the set of firms whose qualifications and proposals were already under review). The district court found that MPDP's sudden appearance at the negotiation stage took the process out of compliance with the CCNA because MPDP was not a firm identified during the RFQ or one that responded to the RFP. We agree.

---

[7] MPDP argues that two other statutes provide a legal basis for the process that produced the Agreement, but these arguments have no merit. First, MPDP reads Fla. Stat. § 255.103—a statute passed after the RFQ took place—to authorize government entities to select general contractors to manage projects covered by the CCNA without adhering to the CCNA. MPDP misreads the statute: § 255.103 uses the word "may" to empower government entities and general contractors to work together on projects covered by the CCNA, *not* to imply that their compliance with the CCNA is optional. *See* Fla. Stat. § 255.103(2) ("A governmental entity may select a construction management entity, pursuant to the process provided by s. 287.055, which is to be responsible [for the project]."). Second, MPDP reads Fla. Stat. § 255.20(1)(d)(2) to require that a government using an RFP or RFQ follow *only* applicable local ordinances, but there is no indication that this provision is to the exclusion of other applicable rules. Indeed, the very next provision reads, "[if the project] [i]s subject to competitive negotiations, the contract must be awarded in accordance with s. 287.055." *Id.* § 255.20(1)(d)(3).

10

MPDP argues in essence that its substitution for Land Capital did not violate the CCNA because businesses are dynamic, and some rearrangement in corporate structure after the first stages of the CCNA process should not invalidate a reformed entity's participation in contract negotiations as the top candidate. This argument might have been tenable if Land Capital actually were an equity member in MPDP or if MPDP had participated in the RFQ. However, neither was the case. First, Land Capital was never an equity member in MPDP.[8] MPDP's unavailing response to this observation at the summary judgment stage was merely that Davison, the principal of Land Capital, was also an officer of MPDP. MPDP acknowledges that "Scott Davison's contribution became eventually limited to himself, as Land Capital collapsed out from under him . . . ." Def.'s Statement of Factual Issues ¶ 32, Jan. 27, 2012. On appeal, MPDP remains unable to identify a legal relationship between the two entities. Second, MPDP did not participate in the RFQ as required by the CCNA—in fact, MPDP did not even exist when Land Capital responded to the RFQ. The district court was correct to conclude, as a

---

[8] MPDP argued at summary judgment that the RFQ's reference to "collaborative partners" essentially allowed MPDP, which shared one executive officer with Land Capital, to piggyback onto Land Capital after the RFP phase, despite not being a formally related legal entity. Def.'s Statement of Factual Issues ¶¶ 34-35, Jan. 27, 2012. However, that phrase in the RFQ refers to a requirement that personnel involved with the eventual project be employed by the Master Developer or a firm retained by the developer. The provision does not obviate the requirement that a single firm make it all the way through the CCNA's mandatory competitive process to be hired.

11

matter of law, that the negotiation between CMPA and MPDP did not satisfy the CCNA.

## C.

MPDP cites various contract law principles to argue that CMPA's approval of the Agreement as written waived any unfulfilled obligations under the CCNA. On this view, CMPA should be held to any deal that it made to the extent that the negotiation process was free from defects generally fatal to any contract, and any remedies for defects should be limited to those normally available for parties to a non-public contract. This argument fails. Under Florida law, the default remedy for violation of a competitive award statute is to void the resulting contract. *Armco Drainage & Metal Prods., Inc. v. Pinellas Cnty.*, 137 So. 2d 234, 238 (Fla. Dist. Ct. App. 1962). The reason is that competitive award statutes are enactments of public policy that do not merely provide contractual rights to a government entering into a contract; such statutes encourage efficient use of taxpayer funds and protect the public from corrupt dealings. *See, e.g.*, *Harris v. Sch. Bd. of Duval Cnty.*, 921 So. 2d 725, 735-36 (Fla. Dist. Ct. App. 2006) (recognizing public interests supersede any interest that the contractor would have had under traditional contract law principles). MPDP cannot cite to any authority suggesting that CMPA could cure statutory defects in the Agreement by adopting it. The district court properly ruled that the Agreement was void as a matter of public policy.

IV.

The only issue remaining for the bench trial following the district court's partial grant of summary judgment was whether MPDP had an equitable defense of good faith to the default remedy of complete disgorgement. *See Wester v. Belote*, 138 So. 721, 726 (Fla. 1931). After hearing testimony regarding misrepresentations made to CMPA by MPDP representatives, the district court found that MPDP failed to establish its own good faith by a preponderance of the evidence.[9] *Cmty. Mar. Park Assocs., Inc. v. Mar. Park Dev. Partners, LLC*, No. 3:11CV60, 2014 WL 415955, at \*16 (N.D. Fla. Feb. 4, 2014). MPDP argues that, at most, the evidence showed only an honest misunderstanding between the parties about the legal relationship between Land Capital and MPDP. We agree with the district court, however, that MPDP is unable to rely on the good-faith exception to disgorgement, irrespective of whether MPDP provided valuable services to the community once the bidding process was complete.

"We review for clear error factual findings made by a district court after a bench trial." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007). Here, it was not error, let alone clear error, for the district

---

[9] MPDP argues that the district court erred when it determined before trial that the burden was on MPDP to prove that it had acted in good faith. The district court's determination was correct because the issue was whether MPDP had an equitable defense; under Florida law, CMPA was not required to show that MPDP acted without good faith for the Agreement to be against public policy and void. *See Wester*, 138 So. at 726.

13

court to find that MPDP failed to meet its burden to prove it acted in good faith.

MPDP argues in essence that the text of the RFP and the Agreement did not create

a duty to share information with CMPA about the collapse of Land Capital or the

specifics of Land Capital's relationship (or lack thereof) to MPDP.  But, this

argument ignores that MPDP had an overarching duty to the public not to continue

with negotiations that were in violation of the CCNA.  *See Local No. 234 of United*

*Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. &*

*Canada v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 823 (Fla. 1953).  CMPA

demonstrated at trial that MPDP's representatives made materially misleading

statements during negotiations.  Despite the fact that neither Scott Davison nor

Land Capital was ever a principal or member of MPDP, representatives of MPDP

described it as a joint venture involving Land Capital and claimed that one of the

actual partners of MPDP was controlled by Land Capital.  These representations,

among others, created a false appearance of continuity in the process by which

MPDP entered into negotiations with CMPA.  It was not error to conclude that

MPDP acted without good faith in using these misrepresentations to secure the

Agreement.

V.

To ensure that funds would be available to satisfy the disgorgement order,

the district court froze MPDP's share of the proceeds from the design-build

contract assigned to Magi. MPDP argues that the district court had no authority to enter this preliminary injunction because there was not a sufficient nexus between those assets and the Agreement.[10] This argument has no merit.

Upon appeal from a preliminary injunction, we review the district court's "judgments[] about the viability of a plaintiff's claims and the balancing of equities and the public interest[]" for an abuse of discretion. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002); *see also Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984). The district court did not abuse its discretion here. This Court has affirmed a preliminary injunction freezing assets for potential disgorgement where we concluded that those assets were profits that resulted from the wrongdoing at issue. *See S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005). We agree with the district court and CMPA that there was a direct causal relationship between MPDP's share of the design-build proceeds and its earlier negotiation over the Agreement. The design-build contract refers to other contract rights between MPDP and CMPA that gave MPDP the right to assign the design-build work to Magi. If MPDP had not represented that it obtained that right from its negotiations with CMPA, then Hoar would not have given up nearly half

---

[10] MPDP also argues that the injunction is invalid because CMPA did not join Magi to the suit or plead a request for the injunction in its complaint. This argument is meritless, as the injunction fell within the court's equitable powers. *See infra ETS Payphones, Inc.*, 408 F.3d at 735.

15

the profits from the design-build contract to partner with MPDP.  Because MPDP's share of the contract was ill-gotten, the district court was within its authority to freeze MPDP's share of the design-build contract.

## VI.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.