# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D17-743

_____

KAPSCH TRAFFICCOM IVHS,
INC.,

     Appellant,

     v.

FLORIDA DEPARTMENT OF
TRANSPORTATION, FLORIDA
TURNPIKE ENTERPRISE,
NEOLOGY, INC., and SMARTRAC,
N.V.,

     Appellees.

_____

On appeal from the Circuit Court for Leon County.
Terry P. Lewis, Judge.

June 4, 2018

PER CURIAM.

This case came before the trial court on the parties' cross-motions for summary judgment. The parties were then—and still are—fully in agreement regarding the material facts. They disagree, however, as to the legal conclusions to be drawn from the undisputed facts. The matter, therefore, was appropriately disposed of by summary judgment. On appeal, Kapsch TrafficCom IVHS, Inc. ("Kapsch") argues that the trial court erred in not granting summary judgment in its favor. We disagree and affirm.

This case centers on a patent license agreement ("Agreement") entered into between the Florida Turnpike Enterprise acting on behalf of the Florida Department of Transportation (collectively, "FDOT"), and Neology, Inc. and its parent company, Smartrac, N.V. (collectively, "Neology"). Under the terms of the Agreement, FDOT paid $7 million to Neology for the nonexclusive right to use technology owned by Neology, namely, Neology's patented 6C technology. The 6C technology would allow FDOT's automated toll collection "readers" to communicate not just with Florida's Sun Pass® system transponders, but with all transponders or "tags" on passing vehicles from any state, in order to assess a toll.[1]

Kapsch filed suit in the trial court claiming the license agreement was illegal because FDOT failed to follow the competitive bidding process dictated by section 287.057, Florida Statutes. That section applies when a state agency seeks to procure "commodities" or "contractual services" costing more than $35,000. § 287.057(1), Fla. Stat. (referencing the "threshold amount provided for CATEGORY TWO in s. 287.017"). The trial court expressly noted that Kapsch did not contend that the

[1] Prior to 2012, the automated tolling technologies utilized throughout the United States employed readers to communicate with vehicle transponders or "tags" to identify the vehicle's tag number through radio frequency identification protocols ("RFID"). But the system lacked uniformity. Some of the more common protocols are known in the industry by their acronyms TDN, SeGo, and 6C. For example, Florida's RFID protocol was SeGo. SeGo, however, could not read a transponder in a vehicle from Georgia, which was calibrated to be read by Georgia's 6C RFID protocol. As a consequence, Florida could not collect a toll from a Georgia vehicle, and millions of dollars in revenue from Georgia drivers were being lost each year.

In 2012, Congress addressed the disparity in state tolling systems by enacting "MAP-21"—the acronym for "Moving Ahead in the 21st Century." *See* Pub. L. No. 112-141, § 1521 [23 USCA § 129 Note (b)]. This federal law required a national, interoperable toll system by July 2016.

Agreement is one for services, and it duly observed that nothing in the agreement requires Neology to deliver a commodity.

Kapsch argued that a patent license is a "commodity" because it is a type of intangible personal property, and "personal property" is specifically listed in the definition of "commodity" in section 287.012(5), Florida Statutes. It also attempted to place the license agreement within the purview of Article IX of the Uniform Commercial Code ("UCC"), as codified in section 679.1021, Florida Statutes, because, in a UCC comment, "general intangibles" are defined as a residual category of personal property, including, for example, a license for the use of intellectual property; hence, a patent license. The trial court rejected both contentions. It observed that "[t]he definitions and comments in Article IX of the UCC [] serve a different purpose than those in section 287.057." It further explained that "[i]f such a broad, sweeping interpretation were given to the term 'personal property' urged by [Kapsch], there would be no reason to list the several examples in [section 287.012(5)]. The term 'personal property' would necessarily include all others."

Instead, the trial court was "more persuaded" by the cases cited by FDOT and Neology describing "the nature of a non-exclusive patent license as a covenant not to sue or a grant of immunity from suit for patent infringement," thereby giving the licensee, FDOT, no property right in the patent itself. *See Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175, 181 (1938) (citation omitted) (holding that a company was "a mere licensee under a nonexclusive license, amounting to no more than 'a mere waiver of the right to sue'"); *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1189 (Fed. Cir. 2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); *Pub. Varieties of Miss., Inc. v. Sun Valley Seed Co.*, 734 F. Supp. 250, 252 (N.D. Miss. 1990) ("A license merely grants a party permission to do something which would otherwise be unlawful; it grants immunity from suit rather than a proprietary interest in the patent."); *see also TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009) ("[A] patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention by way of making, using, selling, etc.; the patentee can only convey a freedom from suit.");

*W. Elec. Co. v. Pacent Reproducer Corp.*, 42 F.2d 116, 117 (2d Cir. 1930) (citations omitted) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly. . . . He has no property interest in the monopoly of the patent, nor any contract with the patent owner that others shall not practice the invention.").

The trial court then turned to the actual wording of the Agreement between Neology and FDOT. In Article 2.1, the Agreement grants FDOT "a nonexclusive, perpetual, nontransferable, license under [the] respective Patent Rights." Applying the logic of the foregoing federal decisions, the trial court concluded "as a matter of law" that "the Agreement does not constitute a purchase of personal property, tangible or intangible. It merely gives FDOT permission to use the 6C technology patented by Neology without risking liability to Neology for patent infringement." The trial court went on to explain that even were the license to be considered a form of personal property, "its very nature makes it impossible to be procured by competitive bid. The right to use technology protected by a particular patent can only be obtained from the patent owner. No amount of competitive bidding can change that."[2]

Lastly, the trial court addressed Kapsch's claim that paragraph 2.8 of the Agreement, which gave FDOT a credit equal to $7 million—the amount of the license fee—against future purchases of products from Neology, brings the agreement within the purview of section 287.057. However, as the trial court

---

[2] The trial court declined Kapsch's invitation to address the issue of whether FDOT's agreement with Neology was a "prudent and wise expenditure of taxpayer's money." It correctly concluded that it was not for the court to decide whether FDOT's agreement "was a good or bad deal." Instead, it properly parsed the various arguments and distilled the issues to the single, relevant legal inquiry: Whether the license agreement "is one for commodities or services as contemplated by section 287.057, [Florida Statutes]." It concluded, "it is not," and we agree.

determined, that issue is moot due to the fact that FDOT and Neology voluntarily amended the license agreement prior to the instant suit being filed to remove paragraph 2.8 from the Agreement. The Agreement contains a severability clause in paragraph 7.8 that permitted the severance of the credit clause without affecting the rest of the Agreement. This is so because, as the trial court rightly decided, paragraph 2.8 "did not go to the essence of the agreement." *See, e.g.*, *Lamaritata v. Lucas*, 823 So. 2d 316, 316 n.3 (Fla. 2d DCA 2002) (applying the severability clause to sever the unenforceable portion of the contract, while the remainder of the contractual provisions remained valid and in force); *Brevard Cty. Bd. of Cty. Comm'rs v. Williams*, 715 So. 2d 1100, 1101-02 (Fla. 1st DCA 1998) (holding that the invalid provision of a settlement agreement should have been severed pursuant to the severability clause rather than declaring the entire agreement unenforceable). *New Prod. Corp. v. City of N. Miami*, 241 So. 2d 451 (Fla. 3d DCA 1970) (holding that "the obligation to perform certain covenants in addition to conveyance of the property (which are for the benefit of the purchaser) are severable," and, "even though the covenants may not be performed or would be illegal they are not integral parts of the contract and the purchaser may require specific performance of the remaining valid portions of the agreement").

Here, it bears repeating that no factual dispute exists regarding FDOT's prime motivation to enter into the Agreement. It desired to obtain a patent license, not to purchase commodities or services from Neology. Therefore, the credit provision was properly severed from the Agreement.

Based upon the foregoing discussion and the trial court's well-reasoned analysis, we hold that summary final judgment was properly entered in favor of FDOT and Neology. Accordingly, we affirm.

AFFIRMED.

WETHERELL and JAY, JJ., concur; MAKAR, J., dissents with opinion.

5

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

MAKAR, J., dissenting.

Government procurement codes are followed meticulously to uphold principles of fair and open competition upon which they are founded. When governmental agencies choose to contract directly with one private vendor, thereby foregoing competitive public bidding, their exercise of discretion must hew closely to lawful parameters of an exception or risk invalidation *See Accela, Inc. v. Sarasota Cty.*, 993 So. 2d 1035, 1044 (Fla. 2d DCA 2008) (county agreements that significantly expanded a piggy-back exception in the procurement code held to be arbitrary and capricious such that the agreements were "void and of no effect").

The privately-negotiated contract in this case—which is "an unusual agreement" and not a "routine transaction" for a Florida governmental agency—is between the Florida Department of Transportation (FDOT) and two vendors, Neology, Inc., and Smartrac N.V., consisting of two related parts: (a) the grant to FDOT of the use of certain intellectual property rights of the vendors for $7 million, and (b) a credit in that same amount to FDOT to be applied to the procurement of related commodities offered by the vendors. The first part extends immunity or indemnity from suit for potential violations of the intellectual property rights of the vendors, for which a colorable claim exists that no "commodity" has been procured and compliance with section 287.057, Florida Statutes, was unnecessary.

But the second part of the agreement, which states as follows, presents a problem:

> 2.8    In addition to the license of Patent Rights under this Agreement, the [FDOT] shall have a credit equal to the amount of the License Fee [$7 million] that may be

applied dollar for dollar against any future purchases of tags or readers or other products sold by or on behalf of the [Neology and Smartrac]. The [FDOT]'s credit balance may be used as full payment for [FDOT]'s purchases until the complete credit balance has been exhausted. [Neology or Smartrac] will provide [FDOT] with a written acknowledgement of the remaining balance of the credit after each purchase made by [FDOT].

No dispute exists that this paragraph provides a $7 million credit for the purchase of commodities ("tags or readers or other products") from the vendors, who expressly wanted to establish a customer relationship for these items with FDOT.

Once the agreement became public, it resulted in controversy and, ultimately, litigation. Mr. Kapsch, the CEO of a competitor, Kapsch Trafficom, who learned of the contract due to a press release, traveled from Austria to meet with the FDOT official in charge, expressing disappointment that his company did not get to participate in the procurement process and claiming it could have provided the technological licensing protocol for free; he also pointed out that the $7 million credit put his company at a competitive disadvantage as to procurement of the listed commodities. Soon thereafter, the FDOT official instructed that paragraph 2.8 be removed and a new agreement was signed, the ostensible purpose being to "provide a confidence level" to vendors by "eliminat[ing] the appearance of an unlevel playing field in a future procurement." The $7 million of bargained-for commodities credit was thereby extinguished in the process.

All this was too little too late. An agreement that included the procurement of $7 million of commodities had been effectuated without compliance with state law; it was privately-negotiated and subject to no public scrutiny before its finalization and release. That it contained a potentially valid agreement for intellectual property rights does not save its overall legitimacy; excising the commodities clause (and foregoing a $7 million benefit to the State) does not change the fact that the procurement process was violated and the agreement overall was invalidly procured. The remedy for non-compliance is to declare the agreement void. *Wester v. Belote*, 138 So. 721, 724 (Fla. 1931) (contract violating public competitive

bid laws "is absolutely void, and that no rights can be acquired thereunder by the contracting party, is beyond question in this jurisdiction."); *Robert G. Lassiter & Co. v. Taylor*, 128 So. 14, 17 (Fla. 1930) (failure to comply with provision as to contracting is a violation that renders the agreement "illegal and void"). Severance of the commodities clause might make sense if the clause were, as the trial court determined, a non-essential one. But a $7 million credit to State coffers—that would negate "dollar for dollar" the FDOT's entire $7 million upfront payment—can't be other than a material one; seven million dollars is not chump change.

And severance sends the wrong message: it normalizes an improper procurement practice, forgiving the agency at great expense to State coffers. It cuts against the grain of principles of procurement laws that must be followed to "prevent favoritism" and are of a "highly remedial character" whose "construction always . . . will fully effectuate and advance their true intent and purpose and which will avoid the likelihood of same being circumvented, evaded, or defeated." *Wester*, 138 So. at 724. And dispensing with the commodities clause seems little different from the types of "exceptions, releases, and modifications in the contract after it is let" that "afford opportunities for favoritism, whether any favoritism is actually practiced or not." *Id.*

FDOT and the vendors counter that the $7 million credit would have been exercised only if either Neology or Smartrac was a successful bidder for these commodities in a future competitive procurement process, but their agreement doesn't say that. Even if it were true, it doesn't excuse the failure to comply with the procurement code in the first instance. The reason is that the $7 million commodities credit is little different than the procurement of gift cards, vouchers, or other similar means of purchasing "tags or readers or other products sold by or on behalf of" the vendors. Kapsch Trafficom and others who compete with the vendors have a legal right to be participants in a competitive procurement of these items, but were excluded. An agency can't do indirectly what it's prohibited from doing directly. *Lassiter & Co.*, 128 So. at 17 ("[C]ity could not circumvent the charter provision by first entering into a legal contract for pavement 'in accordance with plans and specifications on file,' and later, by agreement, change the contract to a different type of pavement or make a new contract."); *see*

*generally Evasion of law requiring contract for public work to be let to lowest responsible bidder by subsequent changes in contract after it has been awarded pursuant to that law*, 69 A.L.R. 697 (1930 & Supp. 2018) (overview of cases consistent with *Lassiter & Co.*). Perhaps FDOT focused on the licensing portion of the agreement, and was lulled into ceding to the commodities clause, which served the vendors' interests of getting a foothold for its commodities. That may be the case, but unlike situations where an agency is entitled to "regroup, reevaluate, redesign, or reject" a project, the commodities clause was a means of avoiding competition that can result in contractual invalidation. *Dep't of Transp. v. Groves-Watkins Constructors*, 530 So. 2d 912, 914 (Fla. 1988).

This case is unlike those where severance of an invalid covenant, such as one requiring that property be rezoned by a city, could be accomplished without prejudice to the parties or the public. In *New Products Corp. v. City of North Miami*, 241 So. 2d 451, 452 (Fla. 3d DCA 1970), the city was sued to force specific performance of a land sales contract in which it promised to the buyer to that it would rezone the property to multi-family. The city changed its mind, the buyer sued, and the trial court held that the illegal covenant made the entire contract illegal. The appellate court disagreed, ruling that the buyer's offer to take the property as currently zoned and waive the covenant was valid. The difference is that a contract made in violation of a procurement statute is void; it is irredeemable, not merely voidable at the behest of the party for whom it would have benefitted. *Wester*, 138 So. at 724 (citing *Lassiter & Co.*); *see Harris v. Sch. Bd. of Duval Cty.*, 921 So. 2d 725, 735 (Fla. 1st DCA 2006) ("A contract entered into in violation of statutes and rules requiring competitive bids 'is absolutely void, and . . . no rights can be acquired thereunder by the contracting party.'") (footnote omitted) (quoting *Wester*, 138 So. at 724).

All this said, the trial judge's decision—upholding the split of the contract into two severable slices—has a Solomonic quality at first glance. But what gets lost is public faith in the procurement process; and let's not forget the $7 million. *Wester*, 138 So. at 724 ("[L]aws of this kind requiring contracts to be let to the lowest bidder are based upon public economy, are of great importance to the taxpayers, and ought not to be frittered away by exceptions.").

_____

Philip J. Padovano of Brannock & Humphries, Tallahassee; Kelly Overstreet Johnson and Russell B. Buchanan of Baker Donelson Bearman Caldwell & Berkowitz, PC, Tallahassee, for Appellant.

Marc Peoples, Assistant General Counsel, Tallahassee, for Appellees Florida Department of Transportation and Florida Turnpike Enterprise; W. Douglas Hall and Peter D. Webster of Carlton Fields, Tallahassee, for Appellees Neology, Inc., and Smartrac, N.V.